Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - -

TARENCE BANKS,
          Plaintiff,
     v.                    Case No. 14-CV-0381
NURSE LESLIE, UNKNOWN,
NURSE BILL, NURSE MEHRING,
CHRISTOPHER SCHMALING, NICK KOLDEWAY,
PATRICK NOONAN, MELISSA A. GONZALES,
SGT. MELISSA MORAN, LT. SHAWN BARKER,
LT. BRADLEY FRIEND, UNKNOWN,
DOUGLAS WEARING, and PORFIRIO LEDEZMA,
          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO DEPOSITION OF
TARENCE BANKS

Racine, Wisconsin
December 17, 2014
10:09 a.m. to 11:45 a.m.
Michelle Hagen
Registered Professional Reporter

---

Page 2

1          A P P E A R A N C E S
2          BASCOM, BUDISH & CEMAN, S.C., 2600
3  North Mayfair Road, Suite 1140, Wauwatosa, Wisconsin
4  53226, by MR. TIMOTHY A. BASCOM, tbascom@bbclaw.com,
5  appeared on behalf of the Racine County Defendants.
6          ALSO PRESENT:  Officer Castaneda.
7             I N D E X
8  WITNESS          EXAMINATION          PAGE
9  TARENCE BANKS    By Mr. Bascom          3
10            E X H I B I T S
11 EXHIBIT NO.:               MARKED  ID'D
12 Exhibit 1   Complaint ....................20   20
13 Exhibit 2   Screening order ...............20   21
14
15 (The original exhibits were attached to the original
16 transcript.)
17 (The original transcript was sent to Mr. Bascom.)
18
19
20
21
22
23
24
25

---

Page 3

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  My name is Steve
3  Peters, CLVS, associated with Halma-Jilek
4  Reporting, Incorporated, Milwaukee, Wisconsin.
5  This is the beginning of the video deposition of
6  Tarence A. Banks, Sr. on December 17, 2014.  The
7  time, 10:09 a.m.
8          This is the case concerning Tarence
9  Banks, plaintiff, versus Nurse Leslie, et al.,
10 defendants, Case No. 14-CV-0381, pending in the
11 United States District Court for the Eastern
12 District of Wisconsin.
13          Will counsel now please state his
14 appearance.
15          MR. BASCOM:  Tim Bascom on behalf of
16 the Racine County defendants.
17          THE VIDEOGRAPHER:  The court reporter,
18 Michelle Hagen, will now swear in our witness.
19          TARENCE BANKS, called as a witness
20 herein by the Defendants, after having been first
21 duly sworn, was examined and testified as follows:
22          EXAMINATION
23 BY MR. BASCOM:
24 Q    Tell us your name, please.
25 A    My name is Tarence A. Banks, Sr.

---

Page 4

1  Q    Mr. Banks, my name is Tim Bascom.  I represent a
2       number of defendants who are corrections officers
3       or otherwise employed by Racine County here at the
4       Racine County Jail, people you have sued in a
5       lawsuit in the Eastern District of Wisconsin.
6          We're here this morning to take your
7       deposition.  As you can see, we've got a court
8       reporter in the room, and she's taking down
9       everything that's being said.  We're also
10      videotaping the deposition, but because she's
11      taking down everything that's being said, at the
12      end of the day she's going to go back to her office
13      and type it up into a transcript so we'll be able
14      to read what everybody in the room says.
15          Because of that process, we have to
16      follow certain rules.  One of the rules you have
17      to follow is only one person can talk at a time.
18      Even though you may know where I'm going with a
19      question, you have to wait until I finish asking
20      it before you begin giving an answer, and I have
21      to wait until you're finished with your answer
22      before I ask a new question because the court
23      reporter can only take down one person at a time.
24      Okay?
25 A    Understood.

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 5

1  Q    Second rule you have to remember is you have to
2       answer verbally and out loud.  You can't nod your
3       head or shake your head.  Even though we've got a
4       video here, we need the transcript to show whether
5       you mean yes or no.  Same reason you can't say
6       mm-hm or unh-unh because they're kind of spelled
7       the same.  So if you forget that and you say mm-hm
8       or um-hum, I may say to you, "Is that a yes or a
9       no?"  I'm not trying to be disrespectful or be
10      rude to you.  I just want to make sure we have a
11      clean transcript.  Okay?
12  A   Okay.
13  Q   If you don't understand a question -- sometimes
14      lawyers ask bad questions.  If you don't
15      understand a question, please tell me and I'll
16      reask it.  If you give an answer, though, I'm
17      going to assume that you heard the question and
18      fully understood it.  Fair enough?
19  A   Okay.  So what if I don't feel comfortable
20      answering a question then?
21  Q   Well, you're sworn to tell the truth under oath.
22      We're here to ask you questions about things
23      related to your lawsuit.  If you feel
24      uncomfortable answering a question, you can tell
25      me why and make an objection, and the judge will

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 6

1       later on rule on whether or not you should be
2       required to answer the question.
3            The rules in depositions are very
4       different than the rules in court.  In court you
5       have to -- lawyers or people who are asking
6       questions have to focus only on what exactly is
7       relevant to the case.  In a deposition like this,
8       it's much broader than that.  It's anything that's
9       reasonably calculated to lead to the discovery of
10      relevant evidence, and the judge will tell you, if
11      we need to get ahold of him, that that's a very
12      broad category.
13           So listen to my questions and if you
14      can answer the question, please do so.  If you
15      don't know the answer to a question, you can tell
16      me that as well.  Okay?
17  A   Okay.
18  Q   All right.  Let's start with a little bit of
19      background about you.  What is your birth date?
20  A   August 18, 1980.
21  Q   And where were you born?
22  A   Chicago, Illinois.
23  Q   How long did you live in Chicago?
24  A   About 17 years.
25  Q   And when -- so when you turned 17 you moved away

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 7

1       from Chicago?
2  A    No, I really left earlier.  I was a ward of the
3       state at an early age.  Me and my brother kind of
4       like just moved up here with my big brother and
5       they emancipated us from DCFS.
6  Q    Okay.  Did you go to high school?
7  A    Yes.
8  Q    Where did you go to high school?
9  A    I went to Harper High School in Chicago, Illinois.
10      I went to Englewood High School in Chicago,
11      Illinois, and I spent a week or something at Park,
12      Washington Park, Racine.
13  Q   Did you graduate from high school?
14  A   No.
15  Q   And what was the last grade you finished in
16      high school?
17  A   Tenth.
18  Q   Tenth grade?  I'd like to start with your earliest
19      employment, and can you tell me coming up to today
20      how you've been employed.
21  A   Through temp services, temporary services.
22  Q   When did you work for the temporary services
23      people?
24  A   Most of the times it was in like '90 -- '99.
25      I worked for Manco [phonetic].  Then I went to

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 8

1       prison.  Got out in 2006.  I worked for a place in
2       Milwaukee called Joe Binders [phonetic], I think
3       it was.
4  Q    Joe Binders?
5  A    Yeah.
6  Q    And what did they do?
7  A    They put like magazines and stuff together.  They
8       bind stuff together.
9  Q    And what was the amount -- tell me when you
10      started working there and when you stopped working
11      there.
12  A   I can't recall.
13  Q   Other than Joe Binders, have you worked for any
14      employer since your time in prison?
15  A   When I just was released I worked at Expel.
16  Q   At what?
17  A   Expel.
18  Q   What is Expel?
19  A   It's a packaging company too.
20  Q   And where was that?
21  A   In Racine, Wisconsin.
22  Q   How long did you work for them?
23  A   It was a temporary service.  Once they done with
24      you they kind of lay you off and you go through
25      QPS and get another employment.

Page 9

```
 1   Q     And was the binder place also through a temporary
 2         employment?
 3   A     Yes.
 4   Q     What was the name of the temporary employment
 5         agency?
 6   A     I don't know.  I know it's on 7th in Milwaukee,
 7         like on Michigan or some -- Downtown somewhere.
 8         But I was -- it was -- at the time I was at the
 9         Parson House on 24th and Locust and I was going --
10         I was living there through like a furlough.
11   Q     Was that a supervised placement?
12   A     Yes.
13   Q     Following your incarceration?
14   A     Yes.
15   Q     Let's talk a little bit about your history of your
16         involvement with law enforcement.  Tell me the
17         first time that you've had any -- any conviction
18         for any crime.
19   A     I don't see how that's relevant.
20   Q     Well, under the rules in the federal rules of
21         evidence, when someone brings a claim like this
22         like you have, under certain circumstances the
23         lawyer representing the defendants is able to ask
24         about whether or not you've been convicted of a
25         crime, and it depends on how long ago it was.
```

Page 10

```
 1         Sometimes if it's more than ten years, judges are
 2         given leeway to keep it out; but sometimes when
 3         it's less than ten years since you were released
 4         from prison or incarcerated in prison, depending
 5         on which is later, then the judges must allow it
 6         to come in.
 7             So what I need to be able to do is
 8         explore with you what's your involvement with
 9         criminal prosecution in terms of convictions so
10         that I can go to the judge and talk with him about
11         whether or not I can ask questions about that at a
12         trial.
13   A     Right, I understand that, but I'm saying I could
14         tell you how many times I've been convicted of a
15         crime.  Me going into them have no relevance
16         towards this lawsuit.
17   Q     Well, but the point is it depends -- there is some
18         relevance to the circumstances depending upon how
19         long ago it was, because under the federal rules
20         of evidence at trial, I can ask you questions
21         about your conviction of a crime.  And so that's
22         what I'm asking about now is in the past what was
23         the first time that you were convicted of a crime.
24   A     The first time I was convicted of a crime was
25         1998.
```

Page 11

```
 1   Q     And what was that crime?
 2   A     I still don't see the relevance of that, though.
 3   Q     Well, it's something that the judge will have to
 4         address when -- when we get prepared for the
 5         trial.  That's why I need to know about the
 6         circumstances so that I can --
 7   A     But I object to it.
 8   Q     I understand you're objecting and your objection
 9         will be noted for the record.  Then answer the
10         question and the judge will determine whether
11         I can ask it at trial.
12   A     I was convicted of burglary.
13   Q     And where was that?  Where did that take place?
14   A     In Racine.
15   Q     And it was in 1998?
16   A     Yes.
17   Q     And were you sentenced to any time in prison?
18   A     No.
19   Q     Following that, was there -- what was the next
20         conviction that you had for a crime?
21   A     I can't recall.  I know I was revocated on that --
22         on that charge.
23   Q     On the 1998 conviction?
24   A     Yes.
25   Q     They revocated your parole -- your probation?
```

Page 12

```
 1   A     Yes.
 2   Q     And did you have to serve time for that?
 3   A     Yes.
 4   Q     And when did you go into jail?
 5   A     In 19 -- I mean in 2000, November, November 4th or
 6         something of 2000.
 7   Q     Of the year 2000?
 8   A     Yes.
 9   Q     And where did you serve your time?
10   A     In Green Bay Correctional Institution.
11   Q     And when were you released from Green Bay
12         Correctional Institution?
13   A     I was released from prison in 2006.
14   Q     Did you serve continuously from the year 2000
15         until the year 2006?
16   A     I was -- yes, but I had -- some more stuff came up
17         while I was in prison.
18   Q     Yeah.  What happened while you were in prison?
19   A     I was indicted.
20   Q     For?
21   A     The drug conspiracy.
22   Q     You were indicted for drug conspiracy while in
23         Green Bay Correction?
24   A     Yes.
25   Q     And what year was that, do you know?
```

Page 13

```
 1   A    I think 2001, 2002, one of them.  Yeah, 2001.
 2   Q    Did you have to serve additional time following
 3        that?
 4   A    I just -- they paroled me from -- from state
 5        prison to the federal prison.
 6   Q    And in what federal prison -- so that was a
 7        federal charge?
 8   A    Yes.
 9   Q    And what federal prison did you then go to?
10   A    First I went in front of Judge Lynn Adelman.  He
11        gave me 30 months with the time credit I had
12        already done and I went to MCC Chicago and then I
13        went to Oxford Correctional, Oxford Federal
14        Correctional Institution.
15   Q    And how long were you at Oxford?
16   A    I got -- I went there and I think a few years.
17        I had 30 more months to do.
18   Q    And that was -- and when were you released from
19        Oxford?
20   A    2006.
21   Q    Okay.  Now, at the time you were in any of those
22        prisons, were any other charges brought against
23        you other than the drug charge?
24   A    Not that I recall.  There was charges brought but
25        it was dismissed.
```

Page 14

```
 1   Q    Okay.  Following your release from federal prison
 2        in 2006 on the drug charges, did you -- did you
 3        get convicted of a crime following that?
 4   A    After I got out of the federal prison?
 5   Q    Yes.
 6   A    Yes.
 7   Q    And what was that crime?
 8   A    One of them got dismissed.  So I know that ain't
 9        going to really matter; right?
10   Q    Correct.  I'd like to know if you were convicted
11        of a crime following your release from prison in
12        2006.
13   A    Yes.
14   Q    And what crime was that?
15   A    Robbery by use of force.
16   Q    And where did that conviction take place?
17   A    In Racine County.
18   Q    And were you sentenced to prison time?
19   A    Yes.
20   Q    And where did you spend your prison time?
21   A    I went to Oshkosh Correctional Institution.
22   Q    Columbia Correctional?
23   A    No.
24   Q    You were at Oshkosh?
25   A    I was at Oshkosh Correctional Institution.
```

Page 15

```
 1   Q    Did you serve your entire time there?
 2   A    No.
 3   Q    Where else did you go?
 4   A    Columbia Correctional Institution.
 5   Q    Okay.  And how long were you at Columbia?
 6   A    From 2009 to 2013.
 7   Q    And you were released in 2013?
 8   A    Yes.
 9   Q    Were you on probation or parole at that time?
10   A    Yes.
11   Q    And how many months or years of supervised
12        follow-up did you have after you were released
13        from Columbia?
14   A    I had four years, four years supervision.
15   Q    So the last time you were convicted of a crime
16        would have been the robbery with use of force; is
17        that true?
18   A    Yes.
19   Q    And your release -- that was in 2007?
20   A    That I was convicted?
21   Q    Yes.
22   A    Yes.
23   Q    And you were released from prison in 2013 on that
24        charge?
25   A    Yes.
```

Page 16

```
 1   Q    Now, you're currently at the Racine County Jail;
 2        is that correct?
 3   A    Mm-hm.
 4   Q    I'm sorry but you have to answer yes or no.
 5   A    Yes.
 6   Q    Thank you.  And when did you first come to the
 7        Racine County Jail in this stay?
 8   A    11/12/13.
 9   Q    So November 12 of 1913 -- 2013.
10   A    Yes.
11   Q    Prior to coming to Racine County Jail on your
12        current charges in November of 2013, had you been
13        here before?
14   A    Yeah.
15   Q    You were here when you were first arrested in 2006
16        on the robbery charge; is that correct?
17   A    Yes.
18   Q    And then periodically over the next number of
19        years you were brought back here while you were
20        staying at Columbia Correctional Institute for
21        certain writs and things like that; correct?
22   A    Yes, sir.
23   Q    So over the years you had been in and out of the
24        Racine County Jail on a number of times?
25   A    Yeah, but like days.  Like I'd be here for a
```

Page 17

```
1    couple days.  Sometimes I wouldn't even make it
2    upstairs.  I'd just be in intake.
3  Q   And so when you were first arrested in 2006, did
4    you spend weeks or months at the jail while you
5    were waiting for your case to be heard?
6  A   356 to be exact.
7  Q   356 days.  So almost a year.
8  A   Yes.
9  Q   And that was in 2006 and 2007.
10 A   Yes.
11 Q   Okay.  And then following your conviction on that
12   crime, periodically you'd come back to
13   Racine County Jail, but it would just be for the
14   most a couple of days.
15 A   Yeah.  Sometimes I'd just ask to stay down here
16   because if I wanted to stay.  I mean, I ain't
17   never had no problems down here, so I just --
18   sometime I just ask my judge to keep me down here
19   for a little while and I stay down here for a week
20   or two just -- I mean, because I used to be on --
21   sometime they'll put me on the pods where it was
22   okay.  So -- but I never had a reason not to stay
23   down here.
24 Q   Now, why are you currently at the Racine County
25   Jail?
```

Page 18

```
1  A   I have a probation hold and I have current
2    charges.
3  Q   And what are the current charges?
4  A   I object to that.  I don't see the relevance of my
5    current charges.  I haven't been convicted of it,
6    so it's not a conviction.
7  Q   One of the issues that we have to address is the
8    fact that you have alleged that the Racine County
9    personnel have violated certain constitutional
10   rights.
11 A   Right.
12 Q   And the nature of those rights will depend upon
13   your status in the jail, whether you have been in
14   jail as a convicted person or whether you are in
15   jail as what's known as a pretrial --
16 A   A pretrial detainee.
17 Q   -- detainee, and I'm trying to develop the
18   information about your status as a pretrial
19   detainee.  So I would like to know -- and it's a
20   matter of public record.  I would like to know
21   what the charges -- I don't want to know the
22   details.  I simply want to know what the charges
23   are against you here that creates your status as a
24   pretrial detainee.
25 A   I'm charged with burglary, three counts of
```

Page 19

```
1    reckless endangerment safety, false imprisonment
2    and possession of a firearm by a felon.
3  Q   Now, you also have made certain claims about your
4    lack of appropriate medical care.
5  A   Mm-hm.
6  Q   And because of that I'd like to ask some questions
7    about how you lost your arm.  And I don't need to
8    go into the great details about that, but you lost
9    your arm in the event that led to your arrest and
10   detention here at the Racine County Jail.  Is that
11   true?
12 A   Could you repeat that?
13 Q   Yeah.  Your arm, you lost your arm in the event
14   that led to your arrest ultimately that led to
15   your being placed here as a pretrial detainee; is
16   that correct?
17 A   I got shot and I lost my arm.
18 Q   And it was in the event that gave rise to the
19   charges that are against you that creates your
20   status as a pretrial detainee here at the jail;
21   true?
22 A   Yes.
23 Q   And my understanding from looking at your records
24   is after you were shot, you were taken ultimately
25   to Froedtert Hospital and were treated there; is
```

Page 20

```
1    that correct?
2  A   I was taken to Wheaton Francis Hospital and then
3    taken to Froedtert Hospital.
4  Q   And following your discharge from Froedtert, you
5    were then brought to the Racine County Jail.
6  A   Yes, sir.
7  Q   And that was in November of 2013.
8  A   Yes, sir.
9  Q   During the time that you were incarcerated at the
10   Racine County Jail prior to November of 2013, so
11   in the past when you were being held here in 2006
12   and 2007 or during the times that you were brought
13   back here from Columbia on writs, talking about
14   those times -- you understand?
15 A   Mm-hm, yes, yes.
16 Q   Did you file any inmate grievances or complaints
17   during those incarcerations here?
18 A   No.
19       (Exhibits 1 and 2 were marked for
20   identification.)
21 BY MR. BASCOM:
22 Q   Mr. Banks, I'm going to show you what has been
23   marked as Exhibit No. 1.  This is the complaint
24   that you filed that is the basis for the lawsuit
25   in this case; is that true?
```

```
 1   A   No, because this has a page that don't go along
 2       with my lawsuit.
 3   Q   This was copied off of -- off of the -- the
 4       Web site at the -- at the court, and we'll just
 5       talk about this.  If I refer to this, this is
 6       Exhibit No. 1.  Okay?
 7   A   But what I'm saying is that's not -- that whole
 8       thing is not the complaint.  There's a page in
 9       there that's not part of the complaint.
10   Q   I understand.  And Exhibit No. 2 is entitled a
11       screening order.  Do you see that?
12   A   Yes.
13   Q   And are you familiar with that document, the
14       screening order?  Have you reviewed that?
15   A   Yes.  I didn't understand it that much.  Oh, the
16       screening order?  Yeah, I understand this.
17   Q   Okay.  The screening order is something that
18       Judge Adelman takes -- does with lawsuits that are
19       filed by pro se inmates where the federal judge
20       will look at it and make a decision about whether
21       or not the inmate has stated things that can go
22       forward as part of the lawsuit.  You're aware of
23       that; correct?
24   A   Right, right.
25   Q   And in that screening order which we've marked as
```

```
 1       Exhibit 2, if you look at page -- page 5.  Why
 2       don't you turn to page 5 of the screening order.
 3   A   Mm-hm.
 4   Q   Do you have it there?
 5   A   Yes, sir.
 6   Q   Okay.  And there's a paragraph in the middle that
 7       starts out "although not entirely clear."  Do you
 8       see that?
 9   A   Yes, sir.
10   Q   I'm going to read starting at the second sentence.
11       It says "At this stage of the proceedings, he,"
12       meaning you, "may proceed on Fourteenth Amendment
13       conditions of confinement and deliberate
14       indifference to a serious medical needs claims
15       regarding the conditions at the jail and the
16       alleged failure to treat his wound as directed.
17       Plaintiff may also proceed on due process claims
18       related to his disciplinary hearings which
19       resulted in segregation stays.  Lastly, he may
20       proceed on an excessive force claim based on the
21       allegations that defendant Koldeway shouldered him
22       causing injury."  Did I read that correctly?
23   A   Yes, sir.
24   Q   Okay.  So what I want to do is talk about those
25       essentially four claims that Judge Adelman has
```

```
 1       said that you can move forward with against the
 2       Racine County defendants.  There's a conditions of
 3       confinement claim, there's a deliberate
 4       indifference to serious medical needs claim,
 5       that's a due process claim related to your
 6       discipline, and there's the excessive force claim
 7       against Koldeway.
 8   A   Yes, sir.
 9   Q   Okay?  So let's start with the conditions of
10       confinement claim.  Okay?
11   A   Okay.
12   Q   Now, as I understand the allegations in your
13       complaint, your conditions of confinement claim
14       essentially revolves around three allegations that
15       you've made.  One is that you do not have a
16       handicap accessible cell.  The second one is that
17       you don't have a handicap accessible shower and
18       you have problems with your accessibility to the
19       shower, and you're having problems with food and
20       laundry and other things like that when you're in
21       the general population.
22           Is that in a broad sense the
23       conditions of confinement claims that you've made
24       in your complaint?
25   A   I think it's more to it than that, but a lot falls
```

```
 1       under that.
 2   Q   Let's talk about those -- those three elements.
 3       Let's talk first about your claim that you were
 4       not given access to a handicap accessible cell.
 5       Okay?
 6   A   Mm-hm.
 7   Q   I'm sorry but you have to answer yes or no.
 8   A   Yes.
 9   Q   Now, you were -- initially when you came to the
10       jail in November of 2013, you were put into a cell
11       in intake; correct?
12   A   Yes, sir.
13   Q   Now, in that cell you had a bed; is that true?
14   A   Yes.
15   Q   And you had a toilet; is that true?
16   A   Yes.
17   Q   So you were given access to a bed and access to a
18       toilet; true?
19   A   True.
20   Q   Now, according to what you've said in your
21       complaint, you felt that it was more difficult for
22       you to be able to use your bed or your toilet
23       because there were no grab holds or handrails or
24       other handicap equipment to allow you to get in
25       and out of bed or on to or off of the toilet; is
```

Page 25

1    that correct?
2  A  Correct.
3  Q  While you had access to the toilet and you had
4    access to the bed, it was more difficult for you
5    because they were not handicap accessible; true?
6  A  I couldn't move when I first got here. It was
7    hard for me to move. I had stitches in my leg.
8    They removed a bone from my leg. I'm missing an
9    arm. I had stitches in my arm. I had stitches in
10   my inner leg and stitches from my ankle -- well,
11   from my thigh right here all the way up to my leg.
12        I couldn't move, period. I had
13   trouble walking. That's why they gave me a cane
14   to get up with, get out of bed, which is something
15   to help me get out of bed with. When I got here
16   it was taken away from me. They rolled me in a
17   room in a wheelchair because I couldn't walk and
18   just threw me in the bed.
19 Q  And then when you needed to get out of bed, you
20   needed to get assistance from a guard?
21 A  No one helped me.
22 Q  You never were helped by anyone --
23 A  No.
24 Q  -- out of your bed.
25 A  No.

---

Page 26

1  Q  How long did you stay in your bed without any
2    help?
3  A  I was in intake for five days. The only time they
4    came in is when they -- the only time I saw them
5    was when they did rounds and I'd tell them I need
6    medication, I needed my medication.
7  Q  And they never, ever helped you off the bed in
8    those five days.
9  A  Never.
10 Q  Were you able to get off your bed yourself in
11   those five days?
12 A  It would take me a long time to do so because
13   I was in pain.
14 Q  I see. It took you a long time and it was very
15   difficult for you to do it, but you were able to
16   ultimately get off of the bed?
17 A  Yeah.
18 Q  And then in order to use the toilet, again, it
19   took you a long time and it was very hard for you.
20   It was very difficult -- you have to let me
21   finish -- it was very difficult for you, but
22   ultimately you were able to use the toilet; true?
23 A  When I first got here I wasn't using the bathroom.
24   That's why when I was at the hospital they was
25   making me use the bathroom. They was giving me

---

Page 27

1    enemas and stuff. So as far as taking a number
2    two, I wasn't able to do that. Urine, I was -- I
3    urinated on myself a few times while in intake.
4  Q  But you were able to get to the bathroom to
5    use the -- go to your toilet in your intake cell
6    with difficulty.
7  A  I just told you, not really, no.
8  Q  You never used the toilet while you were in
9    intake?
10 A  I never had to use -- take a dump in intake.
11 Q  Okay.
12 A  All I had to do was urinate, and when I did, I
13   peed on myself. I got to the toilet at times but
14   most of the times I peed on myself. Several times
15   I urinated on myself because I couldn't make it in
16   time and I'd be always in too much pain.
17 Q  But there were times you were able to get to the
18   toilet to urinate. It was
19   difficult for you but you were able to do it.
20 A  Yes.
21 Q  Now, no one at the jail denied you the use of a
22   toilet. They didn't tell you you couldn't use the
23   toilet; is that true?
24 A  They denied me a handicap accessible cell.
25 Q  I understand -- I understand that's your claim,

---

Page 28

1    but my question is a little different than that.
2    My question is a little different than that.
3    While it was difficult for you to be able to use
4    the toilet in your cell because it was not
5    handicap accessible, they did not deny you the use
6    of a toilet; true?
7  A  No, that's not true.
8  Q  So somebody at the jail said you cannot use the
9    toilet.
10 A  When I first got here I told them I was going to
11   need a handicap accessible cell. So yes, they
12   did.
13 Q  In the cell that you were housed in intake there
14   was a toilet; true?
15 A  Yes.
16 Q  No one ever told you could not use that
17   toilet; true?
18 A  No.
19 Q  What I said is not true?
20 A  No one never told me I couldn't use the toilet.
21 Q  And while it was difficult for you to use it, if
22   you were able to get out of your bed, you were
23   able to use the toilet. True?
24 A  If I wanted to sit down and take a dump on that
25   toilet, no, I wouldn't have been able to do it.

Page 29

```
 1   Q   Why not?
 2   A   Because I couldn't even barely bend my knees by
 3       myself.
 4   Q   But you were able to --
 5   A   When I was at Froedtert Hospital, they helped me
 6       on and off the toilet.  They helped me go to the
 7       toilet.  When they gave me an enema, they helped
 8       me out of bed and took me to the toilet with
 9       either a wheelchair -- the majority of the time
10       the wheelchair.  They helped me to the toilet
11       because I had bones and stuff missing out of my
12       leg.  They helped me to the toilet and helped me
13       on and off the toilet.
14               I was not given -- I was not afforded
15       that here.  The toilets in Froedtert bathroom had
16       hand rails where I could ease myself down to it.
17       The toilets are so low, I'm bending so low to get
18       down on the toilet.  No, I couldn't.  So no.
19   Q   Did you ever ask someone for help and they said,
20       "No, we won't help you," here at the jail?
21   A   You don't --
22   Q   In intake.
23   A   You don't see the COs in intake.
24   Q   You didn't answer my question.  I'm not asking
25       whether you saw the COs.  My question is --
```

Page 30

```
 1   A   I was not.  Okay.
 2   Q   Let me ask my question.  Okay?  Did you ever ask a
 3       CO for assistance in using the toilet and that CO
 4       said no?
 5   A   I was never afforded the opportunity to ask them.
 6   Q   So the answer to my question is no, you never
 7       asked and they said no.  Is that true?
 8   A   The answer to your question is I never asked.
 9   Q   Okay.  The same thing with respect to your ability
10       to get in and out of bed.  You were provided a bed
11       in intake; true?
12       True.
13   Q   And it was difficult for you to get in and out of
14       that bed because there were no handicap handrails;
15       correct?
16   A   True.
17   Q   But they didn't deny you access to that bed; true?
18       They didn't say you can't use the bed or we're
19       going to put you in a cell without a bed.
20   A   Them telling me I can't use a bed is really
21       obsolete in this thing.  It's about me being
22       afforded a bed where I could get out of.
23   Q   I understand -- I understand your claim about not
24       having access to a handicap accessible bed.
25       I understand that that's your claim.  That's not
```

Page 31

```
 1       my question.  Okay?
 2   A   Your question is did they deny me a bed.  No,
 3       I was never denied a bed.
 4   Q   Okay, fair enough.  Now, then it's my
 5       understanding, and you can correct me if your
 6       recollection of this is different, but after you
 7       were in intake, the intake cell, you were then
 8       moved to a medical segregation cell; is that true?
 9   A   Not true.
10   Q   Okay.  Where were you moved after intake?
11   A   I was moved to segregation.
12   Q   You were moved to a segregation cell.  Do you
13       remember the name of the pod that that cell was
14       in?
15   A   It's 2D segregation.
16   Q   Okay.  And in that pod, again, in that cell you
17       were assigned, was there a bed for you to use?
18   A   Yes.
19   Q   And were you able with difficulty to use that bed?
20   A   I had an inmate named Christ Robinson that helps
21       me out of the bed and helped me in my bed at
22       times.
23   Q   Okay.  So with the assistance of the inmate that
24       you've identified in your complaint, you were able
25       with difficulty to get in and out of your bed and
```

Page 32

```
 1       use the bed; true?
 2   A   Yes.
 3   Q   How about was there a toilet in that cell as well?
 4   A   Yes.
 5   Q   And again, were you able to use that toilet with
 6       difficulty and with the assistance of your
 7       cellmate?
 8   A   Yes.  It had no handrail.  They called it med seg.
 9       There's nothing medical about it.  It's just you
10       put segregation people in there and mentally ill
11       people in there.  That's all it is.  There's
12       nothing medical about it.
13   Q   Now, in the complaint you stated that your inmate
14       asked you for food in order to help you.
15   A   Yes.
16   Q   Did you ever get sick because you did not have
17       enough food to eat while you were in that
18       segregation unit?
19   A   Get sick?  No.  I had hunger pains.  If you call
20       that sickness, then yeah.
21   Q   But did you ever -- did you ever get ill?  Did you
22       ever seek medical assistance because of issues
23       related to the lack of food because you were
24       giving your inmate, your cellmate food to assist
25       you on or off the toilet or into your bed?
```

1    A    No, I never said anything about it really to
2         nobody because I didn't want him to stop helping
3         me.  I needed his help at the time.  So I felt
4         like me getting the help that I needed was really
5         more important at the time.
6    Q    Did you ever file an inmate complaint because you
7         felt that you were not getting enough food because
8         you were giving your food to your cellmate because
9         he was assisting you?
10   A    I didn't want to get any write-ups for that.  In
11        the rule book you're not allowed to give people
12        your food.  So I didn't want to get in trouble for
13        it, so that's the reason why I didn't file no
14        complaint for it.  They put you in the hole for
15        stuff like that here.  So I didn't say nothing
16        because I didn't want to get in any trouble by
17        giving him my food and I didn't want him to get in
18        trouble by taking my food because you're not
19        allowed to take or give anybody your food per jail
20        policy.
21   Q    Okay.  Now, you also have a claim in terms of the
22        conditions of confinement claim about access to
23        showers, and as I understand it, your access to
24        shower claim generally falls into two categories.
25        Number one, you claim that you did not have a

1         handicap accessible shower or a proper chair for
2         you to use while you were in the shower so that it
3         was handicap accessible; and number two, you claim
4         that you didn't get a shower often enough because
5         other inmates in the jail were able to shower
6         every day in the day room and you were limited to
7         a certain number of times when you were taken from
8         the day room to intake where the handicap
9         accessible shower was.  Is that generally what
10        your claims are?
11   A    My claims are that I was not afforded a handicap
12        accessible shower.
13   Q    Okay.  That's -- that was one of the claims, and
14        then I read in your complaints that you felt that
15        you should be able to shower more often than you
16        were able to shower.
17   A    Yes.  I caught rashes between my legs.  Right now
18        I'm going to getting cream and stuff for the
19        rashes that I caught between my legs.  On my back
20        I got bumps and on my arm for not getting my arm
21        washed since I been here.  A whole year I was
22        here.  No one helped me wash my arm.  That's one
23        of the things I had to pay to do -- Christ
24        Robinson to do it but sometime he wouldn't do it.
25        Now I got spots and blemishes on my arm and on my

1         back from them not helping me wash my back and my
2         arm.
3    Q    Okay.  Let's talk about this.  When you first came
4         to the Racine County Jail, you were on shower
5         restrictions when you first got here; correct?
6    A    Yes.
7    Q    And that was because there was an issue about not
8         getting your bandage wet; true?  When you first
9         got here?
10   A    It wasn't I would say shower restrictions.  When
11        I was at Froedtert, the nurses came in and helped
12        me wash my back of my arm and I'd sit on the bed
13        and wash my own private part and my hind part and
14        they'd wash my legs and stuff for me.
15             So it wasn't a point of me not being
16        able to be washed.  It's just me not being able to
17        get the bandages wet.  I was able to be helped
18        washed up.  That never -- I was never
19        afforded that opportunity.
20   Q    But according to what I've read, there was a
21        shower restriction imposed by medical staff when
22        you got to the Racine County Jail because they
23        didn't want your bandages getting wet.  Is that
24        true?
25   A    Yes.

1    Q    That was something that the medical staff made a
2         determination.  One of the nurses or doctors made
3         a decision that they didn't want you getting your
4         bandages wet, and so they put you on a shower
5         restriction.
6    A    I never even talked to the doctors or the nurses
7         here about that.
8    Q    Are you aware of whether or not that restriction
9         was imposed by a nurse or a doctor as opposed to a
10        CO or someone within the corrections staff?
11   A    When I went back to Froedtert, I told them I
12        wasn't taking a shower, they wouldn't let me take
13        showers.  Then they told them I was allowed to
14        take showers.
15   Q    We'll get to that.
16   A    Okay.
17   Q    You're getting ahead of me a little bit.  My
18        question is a little different.  Are you aware
19        that when they were not letting you take showers
20        here at the jail when you first got here, are you
21        aware that that was a decision that was made by
22        medical staff?
23   A    No, I wasn't aware of that.
24   Q    Then the doctor at Froedtert approved you to have
25        showers; correct?

1  A    Right.

2  Q    And at that point you began using the day room

3      shower; is that true?

4  A    Yes.

5  Q    You had problems with that.

6  A    I fell in there.

7  Q    Because you had problems because it wasn't

8      handicap accessible; correct?

9  A    Yes. I tried to wash myself up, fell and reopened

10     my arm up under my arm.

11  Q    And at that point they gave you a chair to use; is

12     that true?

13  A    Yeah, like the chair we're sitting in.

14  Q    A plastic chair?

15  A    Yes.

16  Q    And you felt that that was not something that

17     would be appropriate for you to use; is that true?

18  A    It's not enough room in the shower for a chair and

19     an inmate in those showers. That's how I fell,

20     trying to maneuver the chair around in there.

21     I fell and reopened my arm.

22         I talked to Lieutenant Friend about it

23     days before when he came up. He said, "I'm not

24     going to put any handrails in that shower," and he

25     said, "I'm going to give you a chair. That's it.

1      That's all you're getting." He came and talked to

2      me face to face and his exact words, "I'm not

3      putting handrails in those showers. You're going

4      to get a chair and that's it," and left me

5      standing in the hallway and walked away.

6  Q    Now after you had problems with using the chair

7     and the shower in the day room, then they began

8     taking you down to intake to use the handicap

9     accessible shower at intake; true?

10  A    They took me downstairs to use the shower.

11  Q    And the shower in intake, did it have grab rails

12     or no?

13  A    Yes, but they're not -- I wouldn't consider them

14     grab rails because you can't put your hand through

15     it and grab it. It's a metal plate up under it so

16     you fingers only go so far, and it didn't have any

17     handicap accessible chair in it or nothing.

18  Q    Now, you were given a chair to use. Again, it was

19     the same plastic chair that we've been talking

20     about that you had in the day room; correct?

21  A    Yes.

22  Q    So when you began using the shower in intake, you

23     were provided a shower, but again, it was

24     difficult for you to use because you didn't

25     believe it was handicap accessible; correct?

1  A    I know it wasn't handicap accessible.

2  Q    Okay, but you were -- you were able to use that

3     shower with difficulty; true?

4  A    The first time I went down there and I used it, I

5     set back in the chair and it almost tilted over,

6     and after that I told them I wasn't going to take

7     a shower in there because I wasn't going to injure

8     myself no more.

9  Q    But then you began using that shower.

10  A    Once they put a chair inside of it.

11  Q    And once the chair was inside of it and you began

12     using that shower, you were given showers

13     sometimes three times a week, other times every

14     four or five days.

15  A    Yes.

16  Q    So again, you were not denied access to a shower,

17     completely denied access to a shower. It was just

18     more difficult for you and it was limited in terms

19     of the number of times you could take a shower.

20  A    I -- yes, I was denied a shower, yes.

21  Q    And for how long were you denied a shower?

22     Days at a time.

23  Q    Five days at a time, four days at a time?

24  A    Sometime three, sometime four, sometime five.

25  Q    And so three days, four days or five days would

1      elapse and then you would be able to take a

2      shower.

3  A    Yes.

4  Q    So you were not denied a shower. In other words,

5     people didn't say you can't have a shower. They

6     were just limiting the number of days during which

7     you'd be able to take a shower. True?

8  A    No.

9  Q    So my -- maybe we're talking at cross purposes

10     here.

11  A    No, I understand exactly what you're saying.

12     I was denied a shower because the captain --

13     Lieutenant Barker put a derivative in for me to

14     get a shower at these days. So they denied me a

15     shower by not following his derivative and taking

16     me down to the shower. So yes, I was denied a

17     shower.

18  Q    You were denied a shower -- strike that. You were

19     provided access to a shower every three days or

20     maybe every four days or maybe every five days,

21     but you felt you should be accessing that shower

22     more often. True?

23  A    I wanted what the county jail rule book allows me

24     to have, which is not what they was giving me.

25     The county jail rule book say you get a shower

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 41

1      three times a week.  If you take a shower every
2      three days, that's not three times a week.  They
3      violated their own policy.
4  Q   You misunderstand my question.
5  A   I understand your question very well.
6  Q   I understand what point you're trying to make, and
7      you'll be given an opportunity to make those
8      points when we get in front of a jury.  Right now
9      what I'd like you to do is just answer my
10      questions.  Okay?
11      My question is this.  You were given
12      access to a shower every three days or sometimes
13      every four days or sometimes every five days.
14  A   Yes.
15  Q   But you -- so you were given access to a shower
16      those times but you felt you needed access to a
17      shower more often than that; true?
18  A   Yes.
19  Q   What is the shower practice now?
20  A   Right now at this time?
21  Q   Right now today.
22  A   That I'm taking right now?
23  Q   Right.
24  A   I get a shower every day now.
25  Q   And so you're in the shower in the day room?

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 42

1  A   No.
2  Q   You're in the shower in intake?
3  A   Yes.
4  Q   And you're provided access to that shower every
5      day if you want it?
6  A   No.  They -- sometime I don't get showers till
7      2:00, 3:00 in the morning.  That's a whole another
8      day.  So no.
9  Q   So then I misunderstood.  I thought you just said
10      that you get a shower every day.
11  A   Yes.  That don't mean they give me a shower every
12      day.  The doctor ordered that I take a shower
13      every day.
14  Q   And so when was the last time you took a shower?
15  A   Yesterday.
16  Q   What time of day?
17  A   Yesterday was the 16th.  I think I marked down in
18      my log is second shift.
19  Q   And so you're keeping a log of the days and times
20      that you're taking a shower?
21  A   I keep a log of everything.
22  Q   Okay, and did you bring that log with you today?
23  A   No.  I can get it though.
24  Q   I don't need you to get it right now.  I probably
25      will send you a written document asking you to

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 43

1      provide me with a copy of that log.
2  A   Okay.
3      Because I'd like to see that.
4  A   Okay.
5  Q   Are there any other logs that you're keeping other
6      than the one that you just described to me?
7  A   Not really.
8  Q   So you're keeping a log right now of --
9  A   This log, the log that started with my -- not
10      really with the showers.  I just marked the
11      showers down on it, but it really started with the
12      washing of my arm, because I hadn't had my arm
13      washed in a whole year, and the doctor seen I
14      got -- started catching rashes and stuff again on
15      my arm, which they just stopped it, stopped
16      washing my arm again.  They just said they don't
17      do preventative care.  So that mean they wait till
18      my arm get a rash on it again and again start
19      washing it again, which the rash have never left.
20      So they just stopped washing it.
21      But that's what the log is basically
22      about, like the washing of my arm.  They washed it
23      less than a month and then just stopped.  We're
24      not going to wash it no more.
25  Q   When you say they, I don't know who you mean by

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 44

1      they.
2  A   The medical staff here.  I wrote to Lieutenant --
3      I mean Captain Wearing about it just recently.  He
4      said direct your issues to medical, which he's the
5      one who supposed to talk to them about it.  So
6      I don't know where to go from here, but yes, it's
7      still going on.
8  Q   Have you been -- have you been sending -- you're
9      aware that if you have an issue related to your
10      medical care, that you're to fill out a form
11      addressing it to medical; correct?
12  A   Done that.
13  Q   And you've done that with respect to this issue
14      about the washing of your arm and your back;
15      correct?
16  A   Yes.
17  Q   And you're not happy with the response of the
18      medical team to your request for assistance with
19      washing your arm and back; correct?
20  A   I talked to the nurse practitioner the other day.
21      She said there's nothing we can do about it.  When
22      I first got here I asked them about it,
23      Nurse Leslie, and there was a certain CO that was
24      there at the time.  She told me this.  She said,
25      "Well, we're not going to wash your back.  We're

Halma-Jilek Reporting, Inc.     414-271-4466      Experience Quality Service!

Case 2:14-cv-00381-PP    Filed 02/04/15    Page 11 of 21    Document 40-1

Page 45

1    not going to wash your arm," and that was it.

2  Q   That's what nurse -- I'm sorry. That's what the

3    nurse told you?

4  A   Yes. We're not going to assist you with it.

5  Q   Okay. And you've made some complaints to the

6    medical staff about that issue; correct?

7  A   Yes. They told me to put a towel on my leg and

8    wash my arm like that. Virtually impossible.

9  Q   You also indicated in your complaint that you've

10   had some problems with regard to your food and

11   your laundry since you've been in the general

12   population.

13  A   Yes.

14  Q   You according to what I've read in your complaint,

15   you had problems getting the food tray from the

16   slot?

17  A   Yes.

18  Q   You've had problems opening your food?

19  A   Yes.

20  Q   And you had problems with your laundry bag;

21   correct?

22  A   Yes, and my bedding.

23  Q   And what?

24  A   Bedding. Bedding.

25    And I just want to make sure I understand. This

Page 46

1    was something that was again made more difficult

2    for you because you only have one arm, but the

3    Racine County Jail never denied you food; true?

4  A   What I meant in the complaint about that, I was in

5    what they call med seg but really segregation.

6    There's two doors I have to go through. There's a

7    door I got to come out of and then another door I

8    got to go get my food from. I only got one arm,

9    so how do I get back in this door right here?

10   I had to drop my food trays. All type of stuff

11   happened. The officers laughed at me after this

12   happened. So am I denied my food? Yes. I can't

13   get back in my room with it.

14  Q   So you were -- you did not have any food while you

15   were in med seg.

16  A   Yeah, I had food. I had food.

17  Q   So it was difficult for you in med seg or the

18   segregation unit, it was difficult for you to take

19   your food into your cell and to open the food

20   packets themselves, but once you were able to get

21   back to your cell and open the food packet, you

22   did have food; true?

23  A   They -- at times when I first got moved up there,

24   I couldn't come out and get my food. So to do

25   Christ Robinson would go get my food for me and

Page 47

1    bring it to me, but at one point the COs would

2    tell him that I had to come get it myself.

3  Q   And so you started going to get it yourself?

4  A   Yes.

5  Q   Okay. And it was difficult for you to do that?

6  A   It was very extremely difficult for me to do that.

7    I was in pain. I was taking medication for the

8    pain. I was hurting a lot. My bone was missing.

9    Everything was wrong with me.

10  Q   I understand. And with that difficulty, you were

11   able to then have access to some of your food;

12   true?

13  A   Yes.

14  Q   Okay. The same thing is true with this problem

15   you had with the laundry bag. It was difficult

16   for you because you only have one arm, difficult

17   for you to open and close the laundry bag;

18   correct?

19  A   At times I wasn't even washing my clothes. How

20   would I? What -- they don't do it for you.

21   Everything I did, I had to pay for. Everything

22   that got done for me, I had to pay an inmate for.

23   Everything.

24  Q   You were unable to have the Racine County Jail

25   personnel launder your uniform; is that true?

Page 48

1  A   You don't get -- not uniform. Your whites.

2  Q   I'm not talking about the whites. I'm talking

3   about the uniform.

4  A   That don't go with laundry.

5  Q   You don't -- you have a uniform exchange; true?

6  A   Yes, yes.

7  Q   And you were able to exchange your uniform and get

8   a clean one; true?

9  A   Yes.

10  Q   And then does the jail launder your whites?

11  A   They used to come around with laundry bags where

12   you had to put your clothes in a laundry bag, tie

13   it up and put it out there.

14  Q   And that's what you had difficulty doing?

15  A   Yes.

16  Q   Now --

17  A   And with the bedding they give you sheets.

18    They're not fitted sheets. So either I sleep on

19   naked bed or no -- or someone had to tie my sheets

20   for me. The same thing is going on right now.

21   I have no one to tie my sheets.

22  Q   But you do have a mattress; true?

23  A   Yes.

24  Q   And you're sleeping -- if you can't put a sheet

25   down, you're sleeping on the mattress, which is on

Page 49

1  top of your bed; correct?
2  A   Yeah.
3  Q   Let's talk now about your claim about deliberate
4  indifference to serious medical needs.  Okay?
5  A   Yes.
6  Q   As I understand, you talked already about the fact
7  that Nurse Leslie would not help you wash your arm
8  and back; correct?
9  A   No nurse would.  Nurse Bill, Nurse Leslie, the
10  nurse practitioner.  Everybody I talked to, no.
11  Q   And that's a claim you have against the nursing
12  staff; true?
13  A   Yes.  For the record, I don't know -- are you
14  representing the --
15  Q   No, I'm not.
16  A   So why are we asking questions about them?
17  Q   I'm trying to find out what your claims are in
18  this case.
19  A   But that would be irrelevant if you're not -- if
20  you're not representing them.
21  Q   The judge will have to determine what's relevant
22  and what's not relevant.
23  A   Well, I don't feel comfortable answering questions
24  about them that -- that's not -- and I'm not
25  speaking to their lawyer.  I would like to speak

Page 50

1  to a lawyer about what goes on with them.
2  Q   Well, I'm entitled to ask you questions about your
3  claims in this lawsuit whether I represent people
4  or not.  So, you know, I'd like to be able to
5  explore your claims against the medical staff just
6  so I have an understanding of what those claims
7  are.
8       I don't represent any of the nurses in
9  this case, and I don't even know whether they've
10  been properly named or served or anything in the
11  case.  I represent the --
12  A   The jail staff here.
13  Q   The jail staff, which would be Deputy Koldeway,
14  Sheriff Schmaling, Noonan, Gonzales, Moran,
15  Barker, Friend, Wearing and Ledezma.  Those are
16  the people that I represent.
17       I don't represent -- Racine County
18  Correctional Healthcare's been dismissed.  The
19  judge dismissed that.  I don't represent
20  Nurse Leslie or the sued as nurse practitioner
21  Jane Doe or Nurse Bill or Nurse Mehring.  Those
22  are people that I do not represent.
23  A   Well, I don't see why we would have to talk about
24  the claims against them.
25  Q   Well, because I need to know and the point of my

Page 51

1  question is the claims that you're making for
2  somebody not washing your arms is against the
3  nursing staff that you've identified in your
4  complaint; correct?
5  A   Right.
6  Q   Okay.  And that is also true about your claim
7  about the application of your cream to the rash on
8  your back.  You were asking for help with that and
9  the nursing staff didn't provide you with the help
10  that you felt you needed; correct?
11  A   Correct.
12  Q   And that's a claim you have against the nursing
13  staff.
14  A   Not against the defendants that you're
15  representing.
16  Q   Okay.
17  A   So I would like to talk about the things with the
18  people that you're defending and that's it.
19  Q   Now, there's a claim that you've made that during
20  the time that you were in segregation, you did not
21  have access to your mattress.  Do you recall that
22  claim?
23  A   Yes, sir.
24  Q   Now, it's my understanding that the policy in
25  segregation is to provide inmates with access to

Page 52

1  their mattresses between 8:00 p.m. at night and
2  8:00 a.m. in the morning, but then to take the
3  mattresses out of the cell between 8:00 a.m. in
4  the morning and 8:00 p.m. at night; is that
5  correct?
6  A   Correct.
7  Q   So you had access to the mattress from 8:00 p.m.
8  at night till 8:00 a.m. in the morning, but did
9  not have access to it from 8:00 a.m. in the
10  morning till 8:00 p.m. at night.
11  A   The fact is my mattresses was approved through
12  medical.
13       THE REPORTER:  I'm sorry.  Repeat
14  that.
15       THE WITNESS:  My mattresses was
16  approved through medical.
17  BY MR. BASCOM:
18  Q   We'll get to that.  That's not my question right
19  now.
20  A   Okay.  Yes.
21  Q   Okay.  Just so the record's clear, you did have a
22  mattress from 8:00 p.m. at night till 8:00 a.m. in
23  the morning while you were in segregation, but you
24  did not have a mattress from 8:00 a.m. in the
25  morning till 8:00 p.m. at night; is that correct?

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks

December 17, 2014

Page 53

```
 1   A    I will have to say it was from like -- they'll
 2        bring our mattress back at like 9:00 o'clock at
 3        night.  So, I mean, several times they went beyond
 4        what they were supposed to.
 5   Q    But you would have it --
 6   A    Yes, I would have it to sleep on at night.
 7   Q    To sleep on at night.
 8   A    Yes.
 9   Q    Now you have a claim that you were ordered to have
10        or permitted to have more than one mattress?
11   A    Yes, sir.
12   Q    Tell me about that.
13   A    Due to my injuries, I was afforded to have an
14        extra mattress through medical, and the staff here
15        was taking my mattress.  My wounds wasn't even a
16        year old yet.  I still had wounds on my arm that
17        were still open, and they was taking my mattress,
18        making me sleep on steel and concrete for eight
19        hours a day.
20   Q    Just wait.  I think we're talking about two
21        different things right now.  We've already
22        addressed the fact that from 8:00 o'clock or 9:00
23        o'clock at night until 8:00 a.m. in the morning
24        you had a mattress and then it was taken out of
25        your cell from 8:00 a.m. in the morning until the
```

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks

December 17, 2014

Page 54

```
 1        nighttime; correct?
 2   A    Correct.
 3   Q    And we've gone through that and I understand your
 4        claim there.  Now I'd like to talk about your
 5        claim that you were entitled to more than one
 6        mattress.  Is that a claim that you're making?
 7   A    The claim -- yes, I was entitled to more than one
 8        mattress, yes.
 9   Q    And that's what I want to know about.  Tell me
10        what your claim is that you were entitled to more
11        than mattress.
12   A    Per medical.  Per medical I was given an extra
13        mattress, extra blankets.
14   Q    And you were not provided with those while you
15        were in segregation?
16   A    No.  They was taken from me.
17   Q    And do you feel that that violates your rights in
18        which way?
19   A    That's cruel and unusual punishment for one.  How
20        can a jail take anything from you that a
21        doctor approved for you?  They can't.  It don't
22        happen.  I needed that for my injuries.  They took
23        that from me for my injuries.
24   Q    Okay.  Let's talk now about --
25   A    You don't want to talk about that anymore?
```

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks

December 17, 2014

Page 55

```
 1   Q    No.  We'll move on to another topic.  You also
 2        have made requests and I believe you reference in
 3        your complaint that you were not provided with a
 4        prosthetic arm?
 5   A    Yes.
 6   Q    Now, were you told that a medical doctor has made
 7        the determination that you were not entitled to a
 8        prosthetic arm?
 9   A    No.  I was told -- for one, my medical doctor at
10        Froedtert told me I needed to come back down to
11        get fitted for my prosthetic.  Captain Wearing and
12        the staff here denied me to go back down there and
13        get fitted for my medical -- for my prosthetic.
14            Captain Wearing wrote me after I told
15        him that my family -- at first I was on my wife
16        insurance and I don't know what insurance I was on
17        it through, but that's who took care of my doctor
18        bills, the insurance, my medication and everything
19        when I got here.  They told me I needed to come
20        back down here, come back to Froedtert and get
21        fitted for my prosthetic.
22            I wrote Captain -- I talked to the
23        medical staff here.  I wrote Captain Wearing.
24        I wrote Lieutenant Brown.  I wrote everybody.
25        They said that somebody at CHC said my medical --
```

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks

December 17, 2014

Page 56

```
 1        my prosthetic arm was not a medical necessity for
 2        my current situation.  They denied me my
 3        prosthetic.
 4            I went to the doctor again.  She said
 5        if it's okay for you to have a prosthetic there,
 6        we would like for you to come back down here and
 7        get fitted for it.  They denied me again.  The
 8        fact is they didn't have people here with
 9        prosthetics.
10   Q    Okay.  I'm going to back up a little bit.  As far
11        as you were told, someone at CHC made the
12        determination that the prosthetic arm was not
13        medically necessary; correct?
14   A    Before that Lieutenant -- Captain Wearing told me
15        unless I send him something from an insurance
16        company, I was not going -- I'm answering your
17        question.
18            Before this even happened, I wrote to
19        him about it and he said unless you send me
20        something that's preapproved from an insurance
21        company, you will not go get it fitted for you.
22        We're not sending you down there.  And I kept
23        writing him, and then he said he contacted
24        somebody at CHC who told him that my arm was not a
25        medical necessity.  Yes, that's what he said.
```

```
1   Q    Now, did you ever provide anything to
2        Captain Wearing that indicated that your insurance
3        company has preapproved the prosthetic arm?
4   A    I have found out that my wife had took me off
5        her -- off her -- I had got tooken off the
6        insurance.  But my family -- I wrote
7        Captain Wearing and let him know that my family
8        was intending to pay for my prosthetic with money.
9        And he still wrote me back and said unless you
10       send me something from an insurance company that
11       preapproved, you will not go to get fitted for
12       your prosthetic.  So my family was willing to pay
13       for my prosthetic with their own money.
14       And so just so I'm clear, in response to
15       Captain Wearing's inquiry about the insurance, you
16       did not provide him with any insurance information
17       that had preapproved this prosthetic arm; is that
18       true?
19  A    True.  The fact was that me being fitted for it
20       and me getting fitted for it and me having it is
21       two different things.  I can go get fitted for it
22       and pay for it later.  They wanted me to come back
23       down and get fitted for my prosthetic, and he
24       denied me that.
25
```

```
1   Q    Okay.  Let's talk a little bit about the claims
2        you have against the individual defendants.  The
3        first defendant is Sheriff Schmaling.  Have you
4        ever had any personal contact with
5        Sheriff Schmaling?
6   A    I wrote complaints to Sheriff Schmaling.
7   Q    Do you have copies of those?
8   A    Yes.
9   Q    Do you have them with you?
10  A    No.
11  Q    Okay.  So if I ask you for copies of the
12       complaints you made to Sheriff Schmaling, you'll
13       be able to produce those?
14  A    I've got over 70 complaints and I wrote to all of
15       them.
16  Q    I'm just focusing on Sheriff Schmaling right now.
17  A    Yes.  Yes, I have wrote Sheriff -- Lieutenant --
18       Lieutenant -- Captain Wearing always answers
19       Sheriff Schmaling's requests.
20  Q    Have you ever met Sheriff Schmaling?
21  A    No.  And I asked to speak with him too.
22  Q    I'm sorry?
23  A    I have asked to speak with him.
24  Q    But you've never met him?
25  A    No.
```

```
1   Q    Do you have any evidence that Sheriff Schmaling
2        was personally involved in any decisions related
3        to your incarceration here at the jail?
4   A    Excuse me?
5   Q    My question is do you have any evidence, do you
6        know of any facts that leads you to believe or
7        conclude that Sheriff Schmaling was personally
8        involved in any decisions about your conditions of
9        confinement, about your medical care, about your
10       access to showers, things like that, whether
11       Sheriff Schmaling was personally involved with
12       that?
13  A    Sheriff Schmaling runs this county jail.
14  Q    That's not my question.  My question is not
15       whether the sheriff runs the jail.  My question is
16       what do you know, what can you tell me about
17       Sheriff Schmaling's personal involvement in any of
18       the decisions related to your care or treatment
19       here at the jail.
20  A    My -- my answer to that would be that
21       Sheriff Schmaling is the one who runs the county
22       jail.  He sets the rules.  The rules go through
23       him before they get implemented.  So yes, he has
24       personal, personal stake in what goes on in this
25       county jail, yes.
```

```
1   Q    Okay.  Other than the fact that Sheriff Schmaling
2        runs the jail and makes the rules, do you have any
3        other facts or evidence --
4   A    Them my facts right there.
5   Q    Okay.  Nothing else.
6   A    No.
7   Q    Now, how about Deputy Koldeway?  I know there's an
8        incident involving Deputy Koldeway and you, and
9        we'll talk about that in greater detail in a
10       minute.
11       Other than that incident, do you know
12       if Deputy Koldeway was involved in any of your
13       issues related to your handicap accessible cell,
14       your issues related to your access to a shower,
15       any of your medical claims, anything like that?
16  A    Yes.  Deputy Koldeway signed a refusal for me that
17       I didn't authorize him to sign.
18  Q    And which one was that?
19  A    To stop my bandages from getting changed.
20  Q    Now, you claim that you did not make the decision
21       that you did not want to have your bandages
22       changed.
23  A    I told him I didn't want Nurse Leslie or
24       Nurse Bill to do anything with me that day.
25       I wanted to see a doctor.  So they say, "Are you
```

Page 61

```
 1   refusing?"  I said, "No, I'm not refusing, but I
 2   don't want you all to see me."  "Well, you're
 3   going to sign.  We're going to just put you down
 4   for refusing."  I'm not refusing anything.
 5          Deputy Koldeway, "Just give me the
 6   refusal.  I'll sign the refusal," and that's what
 7   he did.  Like yesterday, they had another deputy,
 8   Hernandez, sign a refusal for me.  I'm not
 9   refusing that.  I just don't -- I refuse to see
10   certain doctors that I know are going to tell me
11   the same thing.  I want to see the doctor, not the
12   nurses, the doctor.
13          If I'm paying $8, I can see the
14   doctor.  It says on the medical request form $8 to
15   see the doctor.  If I'm willing to pay $8 -- $8,
16   I should be able to see the doctor.  They're not
17   allowed to sign a refusal for me.  I'm not
18   refusing to see medical.  I want to see the
19   doctor.
20 Q   Other than that incident, does Deputy Koldeway
21   have any involvement in any of the other issues
22   other than the incident where he shouldered you?
23 A   And my medical.  He signed the medical.
24 Q   You told me about that.
25 A   Yes.
```

Page 62

```
 1 Q   Other than that?
 2 A   No.
 3 Q   Okay.  Now, how about Noonan?  What are you claims
 4   against Noonan?
 5 A   Noonan denied me my legal -- my legal material.
 6   When he put me in segregation, he took my legal
 7   material, my prestamped envelopes, my medically
 8   approved blankets, my medical -- and my extra
 9   medical approved mat, all my hygiene, everything,
10   and threw me in medical seg and threw me in
11   segregation.  I didn't get a blanket until
12   3:00 o'clock in the morning.
13 Q   So other than the incident related to your
14   placement into segregation and that claim --
15 A   And my due process.  He wrote me a ticket saying I
16   threatened him for retaliation.  Yeah.
17 Q   We'll talk about that.  I just want to make sure I
18   understand.  The first claim is that he did not
19   permit you to have your personal items in
20   segregation; correct?
21 A   Mm-hm.
22 Q   I'm sorry.  You have to answer yes or no.
23 A   Yes.
24 Q   And then the second claim is when he wrote you up
25   because you threatened him or he claims you
```

Page 63

```
 1   threatened him?
 2 A   Yes.
 3 Q   And tell me about that.
 4 A   He -- I told -- he came in -- they came and got me
 5   from segregation.  He took me over to there.  He
 6   started going through my stuff.  I'm telling him,
 7   look here, man, that's my legal work.  You can't
 8   have --
 9          THE REPORTER:  You have to slow down.
10          THE WITNESS:  Okay.  You can't have
11   this, which is my legal mail.  You can't have
12   these stamped envelopes.  You can't have my combs,
13   my grease, my lotion and all that type of stuff.
14          Then he took my extra mattress.  He
15   took my extra blanket.  He took both of my
16   blankets.  He said I wasn't allowed cotton
17   blankets, which I was.  And I told him I didn't
18   really care about it.  It's okay.  I'm not going
19   to be here for long.  I ain't going to prison.
20   I'm going home.  And he wrote me up and said I
21   threatened him because I said that.
22 Q   Other than those two incidents, any other claims
23   against Noonan?
24 A   There's probably a couple more.  I have to reflect
25   on my --
```

Page 64

```
 1 Q   How about Gonzales?  What are your claims against
 2   Gonzales?
 3 A   I wrote her several times asking about -- she's
 4   the sergeant for classification.  When I got here
 5   I was -- I wrote her and Sergeant Moran.  They --
 6   it's both, so you can get Moran out of the way
 7   too, about my classification, me being classified
 8   max, and I never got a response from them, never,
 9   ever.
10          I got the requests in the room where
11   there's no response to them about me being placed
12   on maximum security, a maximum security pod, and I
13   never got a request.  It's more -- more stuff and
14   I have to reflect on my complaint though.
15 Q   So with regard to Gonzales and Moran, you'd asked
16   for them to reassess your classification and they
17   didn't respond and that's your claim against them?
18 A   No, it's that and more.  It's more things, if you
19   want me to I'll reflect on my complaint real
20   quick.
21 Q   Sure, if you want to take a look.
22 A   I got one.
23 Q   Just refer to the exhibit and tell me whatever
24   page you're referring to.
25 A   On page 13.  Would you like me to read it?
```

Page 65

1  Q   Okay.
2  A   Would you like me to read it?
3  Q   Yeah.
4  A   I say Sergeant Moran -- Gonzales, Moran, Ledezma
5      all denied my due process rights to file a
6      complaint for the jail conditions of a handicap
7      accessible -- handicap accessible cell. Denied to
8      choose what medical, adequate medical -- medical
9      staff I wanted to treat me and denied
10     fair -- denial of fair and impartial disciplinary
11     hearing. That was some or all of them though.
12  Q   So I would like to know with regard to Moran and
13     Gonzales, what did they do.
14  A   Denied me complaints to the handicap accessible
15     cell.
16  Q   So you had asked Gonzales and Moran to provide you
17     with a handicap accessible cell and they denied
18     it.
19  A   They never wrote me back.
20  Q   Okay. Anything else?
21  A   Yeah. My complaints, they never -- that's about
22     it.
23  Q   Complaints about the handicap accessible cell.
24  A   And other things too. I never got a response from
25     them for nothing, nothing at all.

Page 66

1  Q   My question is other than complaining about not
2      being put in a handicap accessible cell, did you
3      make any other complaints to Gonzales and Moran?
4  A   Yeah. There's somewhere through here. I have to
5      look -- I have to look for it.
6  Q   Well, take your time and look for it.
7  A   I concede with that right now.
8  Q   Okay. How about Barker? What personal
9      involvement did Barker have in this case?
10  A   I wrote Barker about everything that was going on
11     with me. Everything, all these issues, I wrote
12     Lieutenant Barker about them. He never --
13  Q   When you say all these issues, you wrote to him
14     about handicap accessible cell.
15  A   Yes.
16  Q   Did you write to him about showers?
17  A   Yes.
18  Q   Did you write to him about medical care?
19  A   Yes.
20  Q   What else?
21  A   My due process. I think I wrote to him and
22     Lieutenant Friend about my due process violations.
23     Like not long ago I got a conduct report and they
24     let Sergeant Ledezma hear my conduct report even
25     though he knew about me suing him and I told him

Page 67

1      he could never be impartial. Lieutenant Friend
2      said, "I'm going to go talk to corporate counsel
3      about it and see what he thinks."
4           And they still let Sergeant Ledezma
5      hear a conduct report with me even though I'm
6      already suing him for due process violation, and
7      the due process violation say you're supposed to
8      have a fair, impartial hearing officer. He can
9      never be fair and impartial.
10          I wrote to them several times about
11     this, even with my -- my other disciplinary
12     hearings with Sergeant Ledezma where he didn't
13     call my witnesses. The nurse -- I got reports,
14     complaints that I filed where there was other
15     officers right there where the witness was right
16     there and I asked him, did Sergeant Ledezma come
17     talk to you about the conduct report. No, he
18     didn't. And that's one of the medical stuff. No,
19     he didn't come talk to me about it.
20          And he found me guilty without hearing
21     any testimony from any witnesses or anybody, just
22     found me guilty. Told me you should have just
23     accepted the five days. Told me he was going to
24     go investigate. Seventeen days later, I get
25     called out the day room to get moved to

Page 68

1      segregation, and it wasn't even for five days. He
2      doubled it to ten days. So --
3  Q   All right. Let's talk a little bit about that as
4      long as you brought that up. There was a hearing
5      or no hearing?
6  A   I would have to say it wasn't no hearing. The man
7      came in and said, "Why didn't you take what you
8      was offered?" I was like, "Because I didn't do
9      anything."
10  Q   Did he ask you questions about what you felt had
11     happened that day?
12  A   He said -- the only thing he asked me was, "How
13     did you plead?" I said, "Not guilty."
14  Q   And did he ask you to describe what you thought
15     had happened that day?
16  A   No.
17  Q   Did he ask you what you believed -- strike that.
18     My understanding of the event is that the nurse
19     claimed that you exposed yourself to her; right?
20  A   Correct.
21  Q   And your response to that was it couldn't have
22     happened because I only have one arm and I
23     wouldn't have been able to cover myself up fast
24     enough. The officer who was there would have seen
25     it.

1   A   Correct, and the officer said in his report I did

2      not see that.

3   Q   Now, did Ledezma talk to you about your claim,

4      about the fact that you didn't believe that it

5      could have happened the way the nurse said it

6      happened because the officer who was there would

7      have seen it?  That's something he talked to you

8      about; correct?

9   A   No.  Ledezma told -- when he came up in there,

10     he -- his first words were, "Why didn't you take

11     the five days?"  I say, "Because I didn't do

12     nothing wrong."  He was like, "Well, you should

13     have took five days."  I say, "Man, is you going

14     to call my witnesses?"  He was like, "Who are your

15     witnesses?"  I said, "Evans wrote my witnesses

16     down."

17          THE REPORTER:  I'm sorry.  Repeat

18     that.

19          THE WITNESS:  Evans, Classification

20     Officer Evans wrote my witnesses down because he

21     set up my hearing.  He say, "Well, who are your

22     witnesses?"  I gave him names and he's like, "Hold

23     on, I'm not --"

24  BY MR. BASCOM:

25   Q   What names did you give him?

1   A   I gave him I think Austin, Austin Rogers.

2   Q   And who's Austin?

3   A   They were inmates that was out in there because at

4      the time we was all on med seg.  That mean

5      everybody's doors open.  So everybody is in the

6      day room.  Because if I'm exposing myself to her,

7      they would have been able to see it too, and at

8      the time she said I did this, I was talking to

9      them.  So of course I wanted them as witnesses and

10     I wanted her to be a witness too.  So that

11     was never --

12   Q   Her being?

13   A   The Nurse Mehring, Mehring, whatever.  I don't

14     know how to pronounce her name, but he never

15     talked to any of the witnesses.

16   Q   Did he answer -- did he respond at all when you

17     said, "I want to have these witnesses present"?

18   A   Yes.

19   Q   What did he say?

20   A   He said, "What are their names?"

21      And then what?

22   A   I gave him the names, and he said, "Well, I'm

23     going to --"  I said, "Hold on.  How you going --

24     you talking like you going to find me guilty."  He

25     said, "I'm going to go talk to them and I'll be

1      back."

2          Seventeen days later they called me to

3      pack up for the hole.  I didn't get a per 30 --

4      350.  You supposed to get a disposition.  As soon

5      as you get found guilty, you're supposed to get a

6      disposition and all that.  I never got none of

7      that.  I didn't even know I was found guilty.  He

8      told me he was going to go talk to the witness and

9      come back and talk to me.  Seventeen days later,

10     they tell me to pack up and sent me to the hole.

11   Q   So you didn't hear anything between the time that

12     you spoke with him and --

13   A   Never.

14   Q   -- the time -- you've got to let me finish my

15     question -- and the time where you were placed in

16     segregation.

17   A   No.

18   Q   Okay.

19   A   Excuse me.  You said something about if you need

20     the copies.  Who will -- who will have to pay for

21     those?

22   Q   We'll work that out.  Have you been involved in

23     the appeal of a disciplinary decision other than

24     the one we're talking about with Ledezma?

25   A   I couldn't appeal.  I don't understand.

1      Okay.  Could you make --

2   Q   I'm asking a very specific question.  You've

3      talked now about this -- the Ledezma due process

4      claim you have.  Okay?  And you've told me that

5      you didn't get notice of the decision for 17 days,

6      and that's in your complaint.  I understand that.

7          My question is a little different than

8      that.  Other than that case, have you been

9      involved in any other disciplinary matters where

10     you appealed a decision?

11   A   Yes.

12   Q   Okay.  Tell me about those.

13   A   I appealed -- once I have wrote that up with

14     Sergeant Ledezma, I got a response from I think

15     Lieutenant Friend or somebody or one of them.

16     I forgot which one I wrote about it.  I know it

17     was either Friend or Barker and then

18     Captain Wearing, but they told me you have 24

19     hours --

20   Q   You're misunderstanding because I'm not asking

21     about the Ledezma one.

22   A   I understand.  I'm telling you how I found out

23     about the appeals now, because I wrote and they

24     told me you have 24 hours to appeal.  So after

25     that, I had got another conduct report and I

Page 73

```
1       appealed it within 24 hours, and that's how I
2       found out that you have only 24 hours to appeal.
3   Q   Tell me about the conduct report that you
4       appealed.
5   A   I think they had a cell search and they found a
6       towel -- no, a spray bottle in the room and it
7       wasn't by my or my cellie bed. It was just in the
8       day -- in our cell, and I appealed it and
9       Lieutenant Friend dismissed the write-up.
10  Q   Any other appeals?
11  A   Yes. I have wrote -- I appealed my administrative
12      segregation status. Well, I didn't appeal that
13      because they says ain't no appeal here. You
14      can't --
15          THE REPORTER: I'm sorry. You'll have
16      to repeat that.
17          THE WITNESS: My administrative
18      segregation status, ain't no appeal for that, but
19      I have tried, and I appealed a couple more
20      disciplinaries.
21  BY MR. BASCOM:
22  Q   And do you remember what the result was any of
23      those appeals?
24  A   Lieutenant Friend heard one and this is the last
25      one with Ledezma, not the one that's on there but
```

Page 74

```
1       it's just a recent one, the one with the
2       impartiality I was just telling you about.
3       I appealed it and Lieutenant Friend -- because a
4       couple of the officers say yeah, that wasn't --
5       wasn't -- he wasn't supposed to hear my appeal.
6       That is impartiality. He can't be impartial
7       because I have a lawsuit pending against him.
8           Lieutenant Friend came up with
9       Sergeant Moran, which those two are named in my
10      lawsuit, and I was talking to them about it and he
11      said he was going to go talk to corporate counsel
12      about it and get back with me. He never did get
13      back with me, never. He never came. He came on
14      the floor. I tried to have an officer talk to
15      him. One of the officers say he said that
16      Lieutenant -- I mean Sergeant Ledezma say he was
17      impartial.
18  Q   Other than that appeal, any other appeals?
19  A   Yes, a few more I got -- I got them upstairs in my
20      room.
21  Q   All right. Let's talk about the Koldeway
22      incident. Tell me what happened.
23  A   I was brought down here from 2D by Noonan and one
24      McDonald and put in intake. That's the day
25      Deputy Koldeway signed a refusal saying I didn't
```

Page 75

```
1       want to get my bandages changed.
2           But before this me and Deputy Koldeway
3       had been having -- when he brung me down for like
4       to get my bandages changed, he was like, "I heard
5       you suing the county jail." I was like, "Yeah."
6       He's like, "Well, I'm four and oh right now." I
7       was like what that got something -- "What that got
8       to do with me? I'm not suing you." And he was
9       like, "I'm just saying I'm four and oh."
10          So that incident transpired every time
11      he came down, he'd come and get me. Like one time
12      on the elevator with the nurse and I was talking
13      to her about my medical stuff and he was like,
14      "You need to quit talking to her." I said, "Why?
15      I ain't doing nothing wrong. I'm talking to her
16      about --" "Well, you just need to be quiet."
17      I was like, "Whatever. I can talk if I want to."
18          So the day when I came down here, they
19      put me in intake. So one day I was getting taken
20      to the shower by a CO Pearson. And when I was
21      coming out the shower, Koldeway was going towards
22      the shower, and I was like, "He the reason I'm not
23      getting my bandages changed."
24  Q   That's what you said?
25  A   Yes.
```

Page 76

```
1   Q   To who?
2   A   I was talking to CO Pearson. And Deputy Koldeway
3       turned around like, "What? What?" And I turned
4       and he dipped his shoulder and ran into me.
5   Q   How far away from you was he when he dipped his
6       shoulder?
7   A   He was probably like right -- right there and he
8       came towards me and then he dipped his shoulder.
9   Q   So 2 feet away, 3 feet away?
10  A   Probably like -- I was probably like right
11      here and he was probably like right here where his
12      little battery thing was and he turned around.
13  Q   Five feet away?
14  A   Yeah, came around and bumped me.
15  Q   Where did he bump you?
16  A   On my -- right here.
17  Q   Your -- your arm that's been removed?
18  A   Yes.
19  Q   Okay. And what happened then?
20  A   I fell backwards and CO Pearson caught me.
21  Q   So you didn't hit the ground?
22  A   No.
23  Q   Okay.
24  A   Stopped him with his other arm. Like, "Hold on,
25      hold on, hold on, hold on," and he was trying to
```

Page 77

1   come like, "You going to fucking come at me?  You
2   going to fucking come at me?  You going to talk
3   shit to me?"  I'm like, "What?"
4           And I was so angry at the time, and
5   Pearson like, "Just come on.  Just come one," and
6   I went and sat on the bench.  And they put me back
7   in the room and I came out.  Well, not putting me
8   back in the room.  I was sitting right there, and
9   she goes like -- I was like, "I want to talk to a
10  sergeant."  And she was like, "You want to talk to
11  a sergeant?"  And I was like, "Yeah," and she was
12  like -- and she told Pearson, "Well, he want to
13  talk to a sergeant.  You got to get him a
14  sergeant."  But Sergeant Moran was sitting right
15  there.  She had seen the thing, seen everything
16  transpire, and she got up and left, and when she
17  came back --
18          THE REPORTER:  Please slow down.
19          THE WITNESS:  Sergeant Moran was
20  sitting at the desk when it happened and then she
21  left, and when she was coming back I was trying to
22  tell her about it and she was like, "File a
23  complaint" and just kept walking.
24  BY MR. BASCOM:
25  Q    So did you file a complaint?

Page 78

1   A    Yes.
2   Q    Before we get to the complaint, tell me, were you
3        injured by Deputy Koldeway?
4   A    Yes.  I had to go back to medical and get my arm
5        wrapped up.  I still had wounds on my arm.
6   Q    You still had wounds at the time?
7   A    Yes.
8   Q    Tell me what happened with your wounds.
9   A    They was bleeding.
10  Q    And so you went back to medical and got them
11       rewrapped?
12  A    Yeah.  I hadn't even got -- I had just came out
13       the shower.  They weren't even wrapped yet.
14  Q    So the wounds were exposed when you were hit?
15  A    Yeah.  I just had my shirt over them.
16  Q    Were they bleeding after you were hit?
17  A    Yes.
18  Q    How long after that did it continue it to be a
19       problem for you?
20  A    It just was painful.  My arm -- this wasn't even a
21       year.  My arm was still sore and messed up.  I was
22       still going to Froedtert for them to -- the last
23       time I had went to Froedtert it was still green
24       stuff running out of my arm.  There was stuff in
25       my arm.  They was going to have to reopen my arm,

Page 79

1   but he just said -- I forgot the word he used for
2   it, but he's like, "Next time you come back down,
3   if it ain't healed, then we're going to have to
4   reopen it up and do it all over again."
5   Q    I just want to focus on problems that you
6        associate with being shouldered by Koldeway.
7        Other than having your wound rewrapped or wrapped
8        by medical, did you seek any medical treatment as
9        a result of any injury --
10  A    Yes.
11  Q    Let me finish -- seek any medical treatment as a
12       result of injuries you sustained when Koldeway
13       shouldered you?
14  A    Yes.  I went to the -- I was in a lot of pain.
15       I went to medical.  They put me on some
16       antibiotics and some painkillers.
17  Q    How long after the shouldering incident did you go
18       to medical?
19  A    The same day.
20  Q    Same day?
21  A    Yes.
22  Q    Any follow-up with medical following that?
23  A    I don't think they put me down for follow-up
24       because I was going down every day any old way or
25       something like that.

Page 80

1   Q    Now, there was -- Koldeway wrote you up as the
2        result of that incident.
3   A    Yes.
4   Q    And there was a hearing on that.
5   A    Yes.
6   Q    And you were found not guilty.
7   A    Right.
8   Q    Are you aware of whether or not Koldeway was
9        disciplined as the result of that incident?
10  A    I have wrote several requests.  No one have got
11       back with me.  I wrote -- Tracy Hintz came and
12       talked to me.  I wrote several requests trying to
13       ask what's going on with that.
14          They told me when Sergeant Ledezma
15       was here -- I mean not Ledezma -- Delarosa, she
16       told me the day she came and talked to me, "If you
17       want to know any information about it, talk to
18       Sergeant Delarosa."
19          They brung me down here one day after
20       their lawyer came and talked to me -- I forgot his
21       name.  Laydoff or something like that, the
22       corporate counsel.  They said just talk to
23       Delarosa, because Delarosa -- not Delarosa -- and
24       Chavez pulled me in the room like -- and he was
25       like, "Just address all your complaints to me

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:14-cv-00381-PP   Filed 02/04/15   Page 20 of 21   Document 40-1

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 81

1    now."
2            And I was like that wouldn't be
3    according to the Prison Litigation Reform Act.
4    I'm supposed to follow the chain of command.  He
5    was like, "Well, just address all your issues to
6    me now because there's been some issues with your
7    complaints not getting to the proper people."
8            So after that I asked him, I was like,
9    "What's going on with the investigation with
10   Deputy Koldeway?"  He said, "We're not privileged
11   to give you that information."
12 Q    Okay.  Since that point in time have you been
13   directing your complaints to the people they told
14   you to direct it?
15 A    I just got into an altercation, a fight, and I --
16   three days before the fight I had wrote Deputy
17   Kold -- I mean Sergeant Delarosa and let him know
18   I was having problems in that pod.
19           The day I had wrote it they brung me
20   down here for showers, and I told Sergeant
21   Delarosa I need to talk to him and he say, "Just
22   write me about it."  I said, "I wrote you about
23   it."  He said, "Okay, I'm going to have a deputy,"
24   which is Deputy Wilson, "to bring the complaints
25   back down."  Deputy Wilson told me he handed them

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 82

1    right to him.
2            The next three days I got into an
3    altercation where I had to defend myself with a
4    broom and fight off an inmate.  And they never
5    answered -- he never sent me a complaint, a
6    request back for my complaints.  I got the
7    complaints upstairs right now.  Never sent me a
8    request about it or nothing.
9            Oh, yeah, one of the appeals I did
10   file is with Lieutenant Friend, and right now
11   placing me in administrative segregation saying I
12   told him I fear for my safety and security, which
13   I never wrote him anything like that.  Steady
14   violating my due process rights.  This is a
15   continuous thing that's going on in this county
16   jail.  They don't have a sound grievance process
17   here neither.
18 Q    Okay.  I'm going to be sending you a written
19   request for all of the -- for copies of any
20   complaints that you have, for copies of any of the
21   diaries or logs or anything like that that you
22   have, and any other documents that you have that
23   you believe supports your claims against my
24   clients, the Racine County jail staff, or any
25   claims you have against medical.

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 83

1            Now, as far as copying expense goes, I
2    will arrange for them to be paid for either by the
3    county or by my office, and I'll have
4    Captain Wearing coordinate getting the documents
5    from you and making copies of them.
6  A    I would not in any way give them copies of -- no.
7  Q    I understand.  We'll have to come to an agreement
8    on how we can get copies of the documents and
9    assure you that nothing's happening to the
10   documents.
11 A    The only way I'm willing to do that unless they
12   bring me down there and they copy them right there
13   in front of me and give them back to me.
14           MR. BASCOM:  Okay.  We'll arrange for
15   that to happen.  With that I'm done.  Thank you.
16           THE VIDEOGRAPHER:  This ends the video
17   deposition of Tarence A. Banks, Sr. on
18   December 17, 2014.  The time 11:45 a.m.
19           (At 11:45 a.m. the deposition
20   concluded.)
21
22
23
24
25

Tarence Banks v. Nurse Leslie, et al.
Tarence Banks
December 17, 2014

Page 84

1  STATE OF WISCONSIN  )
2  MILWAUKEE COUNTY  ) SS:
3            I, MICHELLE HAGEN, Registered
4  Professional Reporter and Notary Public in and for the
5  State of Wisconsin, do hereby certify that the deposition
6  of TARENCE BANKS was taken before me at Racine County Law
7  Enforcement Center, 717 Wisconsin Avenue, Racine,
8  Wisconsin, on the 17th day of December, 2014, commencing
9  at 10:09 a.m.
10           I further certify that I am not a
11  relative or employee or attorney or counsel of any of the
12  parties, or a relative or employee of such attorney or
13  counsel, or financially interested directly or indirectly
14  in this action.
15           In witness whereof, I have hereunto
16  set my hand and affixed my seal of office on this 29th
17  day of December, 2014.
18
19
20  _____
21            Michelle Hagen
22            Notary Public in and for the
23            State of Wisconsin
24  My commission expires August 10, 2018.
25