UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────────────────────

TARENCE BANKS,

        Plaintiff,

                                  Case No. 14-CV-0381

    vs.

NURSE LESLIE PATTON, MAHITA GONE,
NURSE WILLIAM COE, NURSE DANA MEHRING,
CHRISTOPHER SCHMALING, NICK KOLDEWAY,
PATRICK NOONAN, MELISSA A. GONZALES,
SGT. MELISSA MORAN, LT. SHAWN BARKER,
LT. BRADLEY FRIEND, CO JOSHUA EVANS,
DOUGLAS WEARING, and PORFIRIO LEDEZMA,

        Defendants.

─────────────────────────────────────────────────────────────

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

─────────────────────────────────────────────────────────────

    The RCJ Defendants[1], by and through their attorneys, Bascom, Budish & Ceman, S.C., submit this brief in support of their motion for summary judgment:

### INTRODUCTION

    This matter arises from the Plaintiff's incarceration at the Racine County Jail ("RCJ"). The Plaintiff alleges the RCJ Defendants violated his civil rights under 42 U.S.C. § 1983, alleging various conditions of confinement claims, deliberate indifference to his medical needs, due process violations related to his disciplinary hearings and excessive use of force by Defendant Koldeway. (DN 1 and 8.) Pursuant to this Court's Order dated September 10, 2015, the Plaintiff is also allowed to proceed on claims under the Americans with Disabilities Act and Rehabilitation Act.

---

[1] Lieutenant Shawn Barker, Lieutenant Bradley Friend, Sergeant Melissa A. Gonzales, Deputy Nick Koldeway, Sergeant Porfirio Ledezma, Sergeant Melissa Moran, Patrick Noonan, Classification Officer Joshua Evans, Sheriff Christopher Schmaling and Captain Douglas Wearing.

(DN 67.)  Based on the following, the Court must grant summary judgment for these Defendants and dismiss the Plaintiff's claims.

## FACTS

The Plaintiff was booked in RCJ on November 12, 2013.  (*Proposed Findings of Fact ("PFOF")*, ¶1 (DN 147).)  The Plaintiff filed his Complaint on April 3, 2014.  (DN 1.)  The Defendants submit the following statement of facts, which are organized in accordance with the Plaintiff's claims and RCJ Defendants' arguments.

### Allegations against Sheriff Schmaling & Respondeat Superior

The Plaintiff's claims against Christopher Schmaling all arise out of his status as Sheriff. (*PFOF* at ¶2.)

### Failure to Exhaust Administrative Remedies

The RCJ Inmate Handbook provides that when prisoners have a basis for a grievance or complaint, and informal resolution is not possible, a written complaint must be submitted to the jail administrator with the required information and in the required format.  (*Id*. at ¶3.)  The inmate request form must be used, it must be legible, include the inmates name, SPN number, housing location, and date, be signed and submitted without profanity.  (*Id*.)  Any requests that do not meet these conditions or contain threats or profanity will not be responded to.  (*Id*. at ¶4.)  A response or resolution is provided for each legitimate complaint.  (*Id*.)  An inmate may appeal the grievance response by filing a grievance appeal, which must be submitted in writing to the jail administrator within 15 days using the same inmate request form.  (*Id*. at ¶5.)  The Plaintiff herein filed, at a minimum, sixty inmate grievances regarding various complaints.  (*Id*. at ¶6.)  The Plaintiff did not appeal the response to any of his grievances.  (*Id*. at ¶7.)

Inmates may also appeal imposed discipline.  The RCJ Inmate Handbook provides that

disciplinary findings and imposed sanctions may be appealed to the Assistance Jail Administrator or the Lieutenant in charge of Jail Operations. (*Id*. at ¶8.) Once the appeal is returned, this decision can be further appealed to the Jail Administrator. (*Id*. at ¶9.) Appeals must be in writing on an inmate request form and turned over to a staff member within 24 hours of the finding decision. (*Id*. at ¶10.) The Plaintiff received at least six verbal warnings, nine minor violations and twenty-three major violations during his period of incarceration at RCJ. (*Id*. at ¶11.) The Plaintiff appealed the disciplinary decisions for Incident #14-000043 and Incident #14-000248, but both were untimely. (*Id*. at ¶12.) The Plaintiff failed to appeal the remainder of his disciplinary decisions. (*Id*. at ¶13.)

**Plaintiff's Conditions of Confinement Claims**

The Plaintiff was not deprived of a cell, bed, or toilet. (*Id*. at ¶14.) His use and access to these things were made more difficult due to his injuries and due to a lack of hand rails. (*Id*.) The Plaintiff was able to get in and out of bed and use the toilet. (*Id*. at ¶15.) The Plaintiff had difficulty receiving and eating his meals, but was never denied food while at RCJ.[2] (*Id*. at ¶16.) The Plaintiff did not get sick due to an alleged lack of food aside from hunger pains. (*Id*. at ¶19.)

The Plaintiff had difficulty placing his clothes into the laundry bag and tying it in a knot (*Id*. at ¶20.) The Plaintiff was able to exchange his uniform for a clean one and prepare his laundry bag with difficulty. (*Id*. at ¶21.)

The Plaintiff had difficulty tying his bed sheets down to make his bed, but he did receive bed sheet and a mattress. (*Id*. at ¶22.) At no time was the Plaintiff deprived of a bed while in RCJ. (*Id*. at ¶23.)

Upon arrival to RCJ, the Plaintiff was placed on a shower restriction because he could not get his bandage wet. (*Id*. at ¶24.) Upon doctor approval to shower, the Plaintiff was instructed to

---

[2] The Plaintiff testified he often gave away food in exchange for assistance. (*PFOF* at ¶17.) It is a violation of RCJ policy for an inmate to give a meal item to another inmate. (*Id*. at ¶18.)

3

use the dayroom shower. (*Id*. at ¶25.) Dayroom showers are available to inmates on a daily basis between 6:00 AM to 8:00 AM and 8:00 PM to 10:00 PM. (*Id*. at ¶26.) When the Plaintiff had difficulty with the dayroom shower and requested a chair, RCJ provided him with a chair. (*Id*. at ¶27.) Following a request for a handicap accessible shower, RCJ began escorting the Plaintiff to the handicap accessible shower in E-Wing, also known as the intake shower, which had grab rails. (*Id*. at ¶28.) A chair was also placed in the handicap accessible intake shower. (*Id*. at ¶29.) The Plaintiff offered a shower three times a week and at most went five days without a shower. (*Id*. at ¶30.) RCJ records reflect that more often than not, the Plaintiff was provided the opportunity to shower in the handicap accessible shower three times a week but often refused. (*Id*. at ¶31.) As of December 17, 2014, the Plaintiff was provided the opportunity to shower every day in the handicap accessible shower in intake. (*Id*. at ¶32.)

**Plaintiff's Medical Claims**

On March 17, 2014, in a Medical Progress Note, the Plaintiff requested a wheelchair, but the doctor did not prescribe one as medically necessary. (*Id*. at ¶33.) On April 2, 2014, the Plaintiff filed an Inmate Request for Medical Attention form to medical staff requesting a wheelchair. (*Id*. at ¶34.) At no point during the Plaintiff's incarceration at RCJ did a doctor prescribe a wheelchair as a medical necessity. (*Id.* at ¶35.)

The Plaintiff's claim regarding washing his wound and application of rash cream is against the nursing staff. (*Id*. at ¶36.) No medical professional ever prescribed a prosthetic. (*Id*. at ¶37.) Rather, Dr. Herr specifically stated that because the Plaintiff had a functioning arm, there was no need for a prosthetic. (*Id*.)

It is RCJ policy to remove mattresses during the hours of 8:00 AM to 8:00 PM while inmates are placed in disciplinary segregation. (*Id*. at ¶38.) The Plaintiff was only denied a

4

mattress from 8:00 AM to 8:00 PM, and only while he was placed in disciplinary segregation after he was found guilty of violating RCJ policy. (*Id*. at ¶39.) When the Plaintiff was moved to disciplinary segregation in February 2014, he was not prescribed an extra blanket or compression socks. (*Id*. at ¶40.) Even so, inmates placed in segregation retain hygiene items, including a blanket. (*Id*. at ¶41.)

**Plaintiff's ADA and RA Claims**

The Plaintiff was not denied a bed, mattress, food, clothing, laundry, a shower or any services provided by RCJ. (*Id*. at ¶14-16, 20-32.) While certain aspects of jail life were made more difficult due to the Plaintiff's injury, the Plaintiff was not denied any of these services. (*Id*.) When the Plaintiff reported difficulty opening his bag meals, he was thereafter provided his meal on a Styrofoam tray. (*Id*. at ¶42.) When the Plaintiff reported difficulty showering, he was provided a shower chair in the dayroom shower and then subsequently was taken down to the intake shower, which had grab rails and a shower chair. (*Id*. at ¶27-29.) Pursuant to RCJ policy, the Plaintiff was only denied a mattress from 8:00 AM to 8:00 PM while housed in disciplinary segregation. (*Id*. at ¶39.)

Upon arrival to RCJ, inmates are classified into one of three custody levels based on their criminal record, past confinement, adjustment, and disciplinary history. (*Id*. at ¶43.) The Plaintiff received the highest custody classification – "Level 3 Maximum" – due to his extensive and serious criminal history. (*Id*. at ¶44.) The Plaintiff maintained this classification throughout his stay at RCJ, in part due to his significant RCJ disciplinary history. (*Id*. at ¶45.) Cells and dayroom showers for Level 3 Maximum inmates do not contain grab rails for safety and security reasons, including suicide concerns. (*Id*. at ¶46.)

When the Plaintiff first arrived at RCJ, he was placed in various cells within Level 3 units

referred to as "medical segregation" – a housing unit for inmates with special medical requirements pursuant to a request by jail medial staff. (*Id.* at ¶47.) The Plaintiff made repeated requests to be moved out of medical segregation because he felt healthy enough to go to the general population. (*Id.* at ¶48.) On January 13, 2014, with the approval of medical staff, the Plaintiff was moved to a "General Population" cell within a Level 3 Maximum security pod. (*Id.* at ¶49.) Thereafter, the Plaintiff began requesting to be moved to the E-wing, a low security dormitory portion of the jail that was newer and had more "handicap" accommodations, including shower grab rails. (*Id.* at ¶50.) The Plaintiff was denied this movement for security reasons. (*Id.*)

**Plaintiff's Due Process Claims**

An accused inmate may request an administrative hearing on any major rule violation. (*Id.* at ¶51.) Inmates are provided the opportunity to be present at a disciplinary hearing, make a statement and present relevant evidence. (*Id.* at ¶52.) A witness may be allowed to testify if it is not cumulative of other evidence and does not threaten the safety or security of the witness or facility. (*Id.* at ¶53.) A hearing officer may hear testimony of a witness outside the presence of the accused for security purposes. (*Id.* at ¶54.)

Documented as Incident #14-000043, Nurse Mehring reported the Plaintiff had exposed himself to her. (*Id.* at ¶55.) Nurse Mehring immediately notified Officer Venegas who observed the Plaintiff moving his hand away from his groin. (*Id.*) Deputy Mark Heifner investigated the incident, including interviewing the Plaintiff and Nurse Mehring, and prepared a report which documented that the Plaintiff had exposed himself to Nurse Mehring on at least three other occasions, had also exposed himself to Nurses Martinez and Ruskell, and that the repeated problem was brought to the attention of Captain Wearing. (*Id.* at ¶56.) Correctional Officer Venegas completed a supplementary report. (*Id.* at ¶57.)

A disciplinary hearing was scheduled for January 24, 2014 for the incident. (*Id*. at ¶58.) The Plaintiff requested an advocate, requested to confront Nurse Mehring, and requested two inmate witnesses: Gerell Rogers and Tyrone Austin. (*Id*. at ¶59.) The Plaintiff was provided CO Olk as a staff advocate. (*Id*. at ¶60.) Ledezma denied the Plaintiff's request to confront Nurse Mehring because she was unavailable at the time of the hearing. (*Id*. at ¶61.) Tyrone Austin was unavailable as a witness because he had transferred out of RCJ by the hearing date. (*Id*. at ¶62.) Gerell Rogers was either unavailable or refused to appear. (*Id*.) The Plaintiff received ten days in disciplinary segregation following the hearing. (*Id*. at ¶63.)

Documented as Incident #14-000428, Correctional Officer Noonan moved the Plaintiff into disciplinary segregation on February 9, 2014. (*Id*. at ¶64.) CO Noonan prepared an incident report stating that upon arrival in disciplinary segregation, the Plaintiff did not agree with the items he was allowed to have and refused to enter his cell. (*Id*.) After assistance was requested, the Plaintiff made a threat to CO Noonan. (*Id*.)

A disciplinary hearing was scheduled for February 13, 2014 concerning Incident #14-000248. (*Id*. at ¶65.) The Plaintiff requested two inmate witnesses: Larviso Brown and Tyrone Austin. (*Id*. at ¶66.) The Plaintiff was provided CO Olk as a staff advocate. (*Id*. at ¶67.) Sergeant Ledezma asked the Plaintiff if he agreed with the discipline write up as it was written and the Plaintiff stated that he did. (*Id*. at ¶68.) Consequently, the Plaintiff was found guilty by admission. (*Id*.) Inmate Austin was no longer in custody at RCJ at the time of the hearing and could not be called as a witness. (*Id*. at ¶69.) Inmate Brown was not called due to the Plaintiff's admission. (*Id*.) The Plaintiff received fifteen days in disciplinary segregation. (*Id*. at ¶70.)

**Excessive Force Claim**

The Plaintiff testified that Deputy Koldeway "dipped his shoulder and ran into" him or

7

"bumped" him following comments he made over a prior medical issue while passing in the hallway.  (*Id*. at ¶71.)  The Plaintiff testified that CO Pearson, who was escorting him at the time of the incident, prevented him from falling backwards and quickly came between the two.  (*Id*.)  The Plaintiff did not fall to the ground.  (*Id*. at ¶72.)  He felt pain in the area of his arm wound.  (*Id*.)  Following the incident, the Plaintiff went to medical for his regular dressing change.  (*Id*.)

## ARGUMENT

### I.      Summary Judgment Standard

The summary judgment procedure is integral to the just, speedy and inexpensive determination of every action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).  Under Fed. R. Civ. P. 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Whether a genuine issue of material fact exists is a question of law requiring a fact-based legal analysis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009).

### II.     Failure to Exhaust Administrative Remedies[3]

Lawsuits filed by prisoners are governed by 42 U.S.C. § 1997e, the Prison Litigation Reform Act ("PLRA").  The PLRA states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such *administrative remedies as available are exhausted*."  42 U.S.C. § 1997e(a) (emphasis added).  Exhaustion of administrative remedies is mandatory, as the PLRA "eliminated the [district courts'] discretion to dispense with [it]."  *Booth v. Churner*, 532 U.S. 731, 739 (2001).  Exhaustion of administrative remedies is a

---

[3] In his Complaint the Plaintiff asserts that he has filed grievances but that "RCJ does not conform to the standards of the PLRA of 1997(e)."  (DN 1.)  RCJ Defendants are unaware of what the Plaintiff is referring to in this regard.  At a minimum, this reflects the Plaintiff's knowledge of the exhaustion requirement.

condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002). Failure to satisfy the PLRA's exhaustion requirement is an affirmative defense.[4]  *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008).

The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).  The term "prison conditions" applies to prisoners seeking redress for both general prison circumstances and a particular occurrence.  *Porter v. Nussie*, 534 U.S. 516, 520, 532 (2002).  The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006); *see also, Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require").  By requiring inmates to first exhaust available remedies, prison officials are allowed the time and opportunity to respond to the complaints internally, perhaps obviating the need for litigation. *Porter*, 534 U.S. at 524-25 (2002).

All available remedies must be exhausted; they need not be plain, speedy or effective. *Booth*, 532 U.S. at 739.  Even when a prisoner seeks relief not available in grievance proceedings, exhaustion is a prerequisite to suit.  *Id.* at 741.  The potential effectiveness of an administrative response bears no relationship to the statutory requirement. *Massey & Otten M.D. v. Helman*, 196 F.3d 727, 733 (7th Cir. 2000).

The Racine County Jail has an established and detailed grievance process.  The RCJ Inmate Handbook provides that when prisoners have a basis for a grievance or complaint, and informal resolution is not possible, a written complaint must be submitted to the jail administrator with the

---

[4] RCJ Defendants asserted failure to fully exhaust administrative remedies as an affirmative defense.  (DN 19.)

required information and in the required format. A response or resolution is provided for each legitimate complaint. Grievance appeals must then be sent in writing within 15 days to the jail administrator.

Inmates may also appeal imposed discipline. Disciplinary findings and imposed sanctions may be appealed to the Assistant Jail Administrator or the Lieutenant in charge of Jail Operations. Once this appeal is returned this decision can be further appealed to the Jail Administrator. The appeals must be in writing on an inmate request form and turned over to a staff member within 24 hours of the finding decision.

The Plaintiff filed, at a minimum, sixty inmate complaints regarding various grievances. The RCJ staff responded to his complaints and often were able to make some type of accommodation. Assuming, *arguendo*, that the Plaintiff properly filed a grievance with RCJ related to *each* of his alleged claims, the Plaintiff still failed to exhaust RCJ's grievance process. The Plaintiff did not appeal *any* of his inmate grievances and thus failed to exhaust his administrative remedies.

In addition, the Plaintiff received at least six verbal warnings, nine minor violations and twenty-three major violations during his incarceration. The Plaintiff only appealed *two* disciplinary decisions that relate to his due process claims: Incident #14-000043 (Plaintiff found guilty of exposing himself to Nurse Mehring) and Incident #14-000248 (Plaintiff found guilty by admission for threatening Defendant Noonan). However, the Plaintiff failed file the two appeals within the specified time set forth in the Racine County Jail Handbook.

Because the Plaintiff failed to file appeals *at all* as to his various conditions of confinement, indifference to medical needs, ADA, RA and excessive force claims, those claims should be dismissed. Additionally, because the Plaintiff failed to appeal his disciplinary decisions related to

10

his due process claims in a timely manner, those claims should also be dismissed. The exhaustion requirement of the PLRA eliminates *all* of the Plaintiff's claims against the RCJ Defendants and each should be dismissed on this ground alone. Nevertheless, the RCJ Defendants will address additional grounds for dismissal as to each claim individually.

### III. Allegations Against Defendant Schmaling

#### 1. Respondeat Superior and Individual Capacity

It is well-settled that there can be no *respondeat superior* liability under 42 U.S.C. § 1983. *Lanigan v. Vill. of E. Hazel Crest*, 913 F. Supp. 1202, 1209 (N.D. Ill. 1996) (*quoting Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994)). Rather, the official "must actually have participated in the constitutional wrongdoing." *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). It is clear that every claim that the Plaintiff asserts against Christopher Schmaling is based upon the theory of *respondeat superior*.

The Plaintiff's testimony demonstrates that each claim against Christopher Schmaling is entirely dependent upon his status as Sheriff. That is, the Plaintiff asserts the claims against Christopher Schmaling because he is responsible for the conduct of the Sheriff's Deputies and Correctional Officers. For 42 U.S.C. § 1983 purposes, the Plaintiff must demonstrate more than this for individual liability to attach. Accordingly, on this threshold matter, all of the Plaintiff's claims are insufficient as a matter of law to proceed against Christopher Schmaling in his individual capacity and therefore should be dismissed.

#### 2. Official Capacity

While unclear (both as to the Complaint and Screening Order), the RCJ Defendants liberally interpret the Plaintiff's Complaint as asserting an official capacity claim against Schmaling related to the RCJ grievance and disciplinary procedures: denial of "due process right

11

to redress complaints" and failure "to put a sound grievance process in place." (DN 1, p. 19.) This claim must be dismissed.

In order to survive summary judgment on a § 1983 official-capacity claim the Plaintiff must present evidence demonstrating the existence of an "official policy" or "widespread custom" and must show that the policy or custom was the *cause* of an alleged constitutional violation. *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). First, as articulated above, RCJ has an established and detailed grievance, disciplinary and appeals procedure. Despite the Plaintiff's criticisms, he actively used RCJ's grievance process.

Second, and more importantly, any right to a grievance procedure is a procedural right, not a substantive one. *Antonelli v. Sheaham*, 81 F.3d 1422, 1430 (7th Cir. 1996) (*citing Shango v. Jurich*, 681 F.2d 1091, 1101-02 (7th Cir. 1982)). Accordingly, an inmate grievance procedure does not give rise to a liberty interest protected by the Due Process Clause. *Id.* Moreover, the Plaintiff's invocation of the judicial process indicates that RCJ has not infringed on his right to redress grievances.

## IV. Conditions of Confinement

As a pretrial detainee, the Plaintiff's claims arise under the Due Process clause of the Fourteenth Amendment as opposed to the Eighth Amendment's Cruel and Unusual Punishment clause. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). This distinction is largely irrelevant as the claims are analyzed under the same standard. *Whiting v. Marathon Co. Sheriff's Dept.*, 382 F.3d 700, 703 (7th Cir. 2004).

Eighth Amendment claims based on unconstitutional prison conditions require the Plaintiff to show he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First,

12

objectively, sufficiently serious injuries are those that deprive an inmate of the, "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Jail administrators are given "wide-ranging deference" in executing practices designed to maintain security and order. *Bell v. Wolfish*, 441 U.S. 520, 548 (1979). In evaluating the constitutionality of conditions of pretrial detainees', the central question is whether those conditions amount to punishment. *Id.* at 535-36.

The Plaintiff alleges several conditions of confinement claims; all are without merit.

### 1. Handicap Accessible Cell

The Plaintiff alleges that he was denied a handicap accessible cell. While it is unclear what the Plaintiff deems a handicap accessible cell, he has specifically alleged that he was placed in various cells without bed rails or wall rails and thus had difficulty getting in and out of bed and using the toilet. The Plaintiff also alleges he had difficulty eating his meals, tying his laundry bag and tying his bed sheets.

In *Jaros*, the plaintiff alleged that he had difficulty using the toilet and obtaining food because of his handicap. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012). The court upheld the dismissal of his conditions of confinement claim because the plaintiff was not "deprived" of any of these things. *Id.* at 671. Instead, the plaintiff's use of toilets and access to food was made "more difficult". *Id.* Moreover, although Jaros alleged he sometimes missed meals, he did not allege that occasionally skipping a meal endangered his health. *Id.*

13

As in *Jaros*, here, the Plaintiff has not alleged that he was deprived of a cell, bed, or toilet, only that his use and access to these things were more difficult due to his injuries and lack of hand rails. While it was difficult to get in and out of bed and use the toilet, the Plaintiff admits that he was able to do both. At no time was the Plaintiff deprived of a bed or toilet.

While the Plaintiff alleges he had difficulty receiving and eating his meals, he admits that he was never denied food while at RCJ. When the Plaintiff communicated his difficulty in opening his meal bags, RCJ began providing his meals on Styrofoam trays. The Plaintiff further admits that he did not get sick due to an alleged lack of food[5] aside from hunger pains. At no time was the Plaintiff deprived of food while in RCJ.

Further, the Plaintiff admits that he was able to exchange his uniform for a clean one and prepare his laundry bag with difficulty. While the Plaintiff alleges he had difficulty tying his bed sheets down and making his bed, he admits he received bed sheet and a mattress. At no time was the Plaintiff deprived of laundry services or a bed while in RCJ.

The undisputed facts show that although the Plaintiff's injuries made his incarceration within RCJ more difficult, the Plaintiff was not deprived of a cell, bed, toilet, food, laundered clothes, bed sheets or a mattress. Accordingly, the Court must dismiss this claim.

### 2. Handicap Accessible Shower & Shower Chair

In *Jaros*, the plaintiff alleged that he had difficulty showering because of his handicap. *Id.*, *supra*. The court upheld the dismissal of his condition of confinement claim because the plaintiff was not "deprived" of a shower. *Id.* at 671. Instead, the plaintiff's use of the shower was made "more difficult" by the absence of grab bars. *Id.* Jaros admitted that he showered four times a month and the court noted that limiting inmates to weekly showers does not violate the 8th

---

[5] The Plaintiff testified that in order to receive help for various tasks, he often gave away food in exchange for assistance. However, it is a violation of RCJ policy for an inmate to give a meal item to another inmate.

Case 2:14-cv-00381-PP   Filed 03/21/16   Page 14 of 31   Document 148

Amendment.  *Id.* (*citing Rodriguez v. Briley*, 403 F.3d 952, 952 (7th Cir. 2005); *Henderson v. Lane*, 979 F.2d 466, 468–69 (7th Cir. 1992); *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988)).

The Plaintiff's allegation that he was denied a handicap accessible shower and shower chair are without merit.  Upon arrival to RCJ, the Plaintiff was placed on a medical shower restriction because he could not get his bandages wet.  Once the doctor approved showers, he was instructed to use the dayroom shower, accessible to the Plaintiff on a daily basis.  When the Plaintiff had difficulty with the dayroom shower and requested a chair for use within the shower, RCJ provided him with a chair.  Despite the availability of the dayroom shower and shower chair, the Plaintiff requested a "handicap accessible shower."  Therefore, RCJ began regularly escorting the Plaintiff to the handicap accessible shower in the E-wing (or intake), which had grab rails.  Upon request, a chair was also placed in the handicap accessible intake shower.

Once RCJ began escorting the Plaintiff to the shower in intake, the Plaintiff admits that he was given a shower three times a week and at most went five days without a shower.  RCJ records reflect that, more often than not, the Plaintiff was provided the opportunity to shower in the intake shower three times a week but often refused.  Furthermore, as of December 17, 2014, the Plaintiff was provided the opportunity to shower every day in the handicap accessible shower in intake.[6]

At no time during his incarceration was the Plaintiff deprived of a shower.  The Plaintiff only alleges that the use of the shower was difficult and that he was not receiving a shower in intake as frequently as he wished.  RCJ accommodated the Plaintiff's requests by providing a chair in the dayroom shower, access to the handicap accessible intake shower, including a shower chair, and increasing the frequency of showers.  Even assuming, *arguendo*, that the Plaintiff only

---

[6] Notwithstanding, the Plaintiff always had access to the dayroom shower.

received a shower every 5 days for a period of time, this is well within the weekly showers as accepted by the Seventh Circuit in *Jaros*. The Court must dismiss this claim.

## V. Deliberate Indifference to Serious Medical Needs

As a pre-trial detainee, the Plaintiff's inadequate medical care claims are founded under the Fourteenth Amendment. However, courts analyze pre-trial detainee inadequate medical care claims under the analogous standards of the Eighth Amendment. *Whiting*, 382 F.3d at 703. Under the Eighth Amendment analysis for inadequate medical care, a plaintiff must show: 1) that his medical need was objectively serious; and 2) that the official(s) acted with deliberate indifference to the prisoner's health or safety. *Farmer*, 511 U.S. at 834; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997). Factors indicating a serious medical need include the "existence of an injury a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Monk v. Beth*, Case No. 04-C-1133, 2006 U.S. Dist. LEXIS 57950, 9-10 (E.D. Wis. 2006) (internal citations omitted).

Prison officials' acts are deliberately indifferent when committed, "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). However, neither negligence nor gross negligence provide sufficient basis for liability. *See Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). A deliberate indifference finding requires evidence "that the official was aware of the risk and consciously disregarded it

nonetheless." *Chapman*, 241 F.3d at 845 (*citing Farmer*, 511 U.S. at 840-42).

When analyzing the Plaintiff's claims, the actions of medical professionals and non-medical professionals are analyzed differently. Non-medical professionals are entitled to rely on medical professionals' expertise and medical determinations. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2012). In this case, the RCJ Defendants are non-medical professionals. The Plaintiff asserts several deliberate indifference claims. All of the claims are without merit.

### 1. Lack of Subjective Knowledge and Conscious Disregard

At the outset, any deliberate indifference claim against the RCJ Defendants must be dismissed for lack of evidence they had personal involvement in any decision related to the Plaintiff's medical care. *See e.g. Payne v. Churchich*, 161 F.3d 1030, 1039 (7th Cir. 1998) (noting that 42 U.S.C. § 1983 liability cannot attach absent personal involvement). As noted above, to prove RCJ Defendants were deliberately indifferent to the Plaintiff's known, serious medical needs, the Plaintiff must show that each RCJ Defendant subjectively knew of and consciously disregarded a serious risk of harm to the Plaintiff. *Chapman*, 241 F.3d at 845 (*citing Farmer*, 511 U.S. at 840-42). This, the Plaintiff simply cannot do.

First, there is no evidence that any of the RCJ Defendants made any decisions concerning the Plaintiff's medical treatment one way or another. Moreover, based upon the record (and as detailed below), to the extent the RCJ Defendants knew of a particular medical need, the evidence indicates the opposite of deliberate indifference.

Furthermore, the Plaintiff has not alleged that denial the various items posed a substantial risk to his safety or health. To survive summary judgment, the Plaintiff must provide evidence that he experienced more than discomfort. *Chapman*, 452 U.S. at 349 ("The Constitution does not mandate comfortable prisons.") The Plaintiff has not and cannot do this. Accordingly, the RCJ

17

Defendants are entitled to summary judgment with respect to the Plaintiff's deliberate indifference to medical needs claims.

### 2. Denial of a Wheelchair

Assuming, *arguendo*, that the Plaintiff met the subjective element and substantial risk elements listed above, his claim fails under *McGee*. In *McGee*, the plaintiff alleged he suffered severe pain and leg swelling when he was forced to wear ankle shackles and denied a wheelchair after undergoing the removal of cancerous leg tumors. *Id.* at p. 478. The court granted the defendants' motion for summary judgment because there was no evidence that any medical professional ever stated that ankle shackles were contraindicated or that anyone prescribed a wheelchair. *Id* at pp. 484-485. Therefore, the non-medical professionals were exempt from liability because they relied on the medical professionals' opinions that ankle shackles were appropriate and no wheelchair was medically necessary. *Id.*; *see also Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008).

Just like the non-medical professionals in *McGee*, the RCJ Defendants in this case are exempt from liability because there is no evidence in the Plaintiff's medical file that any physician ever prescribed a wheelchair. On March 17, 2014, in a Medical Progress Note, it was documented that the Plaintiff requested a wheelchair, but the doctor did not prescribe one as medically necessary. On April 2, 2014 (one day prior to filing his Complaint) the Plaintiff filed an Inmate Request for Medical Attention form to medical staff again requesting a wheelchair. However, at no point during the Plaintiff's incarceration at RCJ did a doctor prescribe a wheelchair as a medical necessity.

Based on the above, there is no evidence the RCJ Defendants were deliberately indifferent to the Plaintiff's request for a wheelchair.

### 3. Improper Wound Treatment, Including Denial of Prosthetic

The Plaintiff's wound treatment claim is also governed by *McGee* because the medical professionals were in charge of wound treatment. The Plaintiff admits his claims regarding washing his wound and application of rash cream is against the medical Defendants. Regardless, the RCJ Defendants neither provided medical treatment nor denied any treatment accommodation request.

Similar to the Plaintiff's wheelchair claim, no medical professional ever prescribed a prosthetic. On the contrary, Dr. Herr specifically stated that because the Plaintiff had a functioning arm, there was no need for a prosthetic. Therefore, the RCJ Defendants are exempt from liability because they relied on the medical professionals' opinions not to prescribe a prosthetic arm.

Based on the above, there is no evidence the RCJ Defendants were deliberately indifferent to the Plaintiff's wound treatment, including his request for a prosthetic.

### 4. Denial of a Regular Shower

To the extent the Plaintiff alleges that the denial of a regular shower amounted to deliberate indifference to a serious medical need, the RCJ Defendants have already established that such a claim is without merit. As indicated above, several accommodations were made to assist the Plaintiff with showers. Furthermore, the Plaintiff has admitted to receiving a shower in intake three times a week and at most going five days without a shower[7], an amount accepted by the Seventh Circuit in *Jaros*.

Assuming, *arguendo*, that the regular use of a shower was necessary to address a serious known medical need, the evidence indicates that the RCJ Defendants were anything but deliberately indifferent. The RCJ Defendants made numerous shower accommodations and

---

[7] RCJ Defendants maintain that as of December 17, 2014, the Plaintiff was provided the opportunity to shower every day in the handicap accessible shower in intake.

increased the frequency of offered showers, something the Plaintiff confirms by his own admissions. Based on the above, there is no evidence the RCJ Defendants were deliberately indifferent to the Plaintiff's request for regular showers.

### 5. Denial of Mattress, Blanket, and Socks

The deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment. *Rodriguez*, 403 F.3d at 952-3. It is RCJ policy to remove mattresses during the hours of 8:00 a.m. to 8:00 p.m. while inmates are placed in disciplinary segregation. Indeed, the Plaintiff admits he was only denied a mattress from 8:00 a.m. to 8:00 p.m., while housed in disciplinary segregation. The Plaintiff was placed in disciplinary segregation only after he was found guilty of violating RCJ policy. As long as the Plaintiff did not violate established RCJ rules, he would remain out of disciplinary segregation and be allowed to keep his mattress 24 hours a day. By failing to comply with RCJ policies, the Plaintiff was placed in disciplinary segregation for limited periods of time. The Plaintiff punished himself.

Inmates placed in disciplinary segregation retain hygiene items, including a blanket. When the Plaintiff was moved to disciplinary segregation in February 2014, he was not prescribed an extra blanket or compression socks. Even if the Plaintiff had a prescription for these items (and assuming they were removed during his housing in disciplinary segregation), under *Rodriquez* the Plaintiff cannot convert the consequences of his noncompliance with RCJ rules into a constitutional violation. Furthermore, as stated above, the Plaintiff has not alleged that RCJ Defendants were aware that denying these items posed a substantial risk to his safety or health. To be sure, the Plaintiff has not alleged that denial of an extra blanket or compression socks posed a substantial risk to his safety or health. There is simply no evidence the RCJ Defendants were

deliberately indifferent as to these claims.

## VI.    ADA and RA

The Plaintiff was allowed to proceed under the ADA and Rehabilitation Act for failure to accommodate his physical impairment.  Title II of the Americans with Disabilities Act of 1999, 42 U.S.C. § 12131, provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act states:

> No otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability. . . be denied benefits of. . . any program or activity receiving Federal financial assistance. . .

29 U.S.C. § 794(a).  The standards applicable to one act are applicable to the other.  Title II of the ADA was modeled after sec. 504 of the Rehabilitation Act; the elements of the claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other. *See Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n. 6 (7th Cir. 1999); *see, also, Grzan v. Charter Hosp. of Northwest Indiana*, 104 F.3d 116, 123 (7th Cir. 1997). Similarly, the relief available to the Plaintiff under these provisions is coextensive. *Jaros*, 684 F.3d at 672.

The chief difference between the two statutes is that the Rehabilitation Act applies only to entities receiving federal funding, while Title II of the ADA contains no such limitation.  Another difference is that the Rehabilitation Act requires that the exclusion be solely by reason of disability, while the ADA requires only that the exclusion be by reason of the disability.  For purposes of this motion, the minor differences are irrelevant and the RCJ Defendants will confine their analysis to the ADA.

21

It is well-established that the ADA authorizes suits only against public entities, therefore the Plaintiff may not proceed against the RCJ Defendants in their individual capacities. *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000). To establish a violation of Title II of the ADA, the Plaintiff must identify 1) a "physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(2)(A); 2) "the services, programs or activities" of the jail that are being denied him because of his disability, 42 U.S.C. § 12132; and 3) the "reasonable accommodation" he is seeking that a particular defendant has refused to provide. 42 U.S.C. § 12131(2); *see also, Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996).[8] Discrimination by reason of disability can be established by evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide reasonable modification, or that the defendant's rule disproportionately impacts disabled people. *See Washington*, 181 F.3d at 847.

If the plaintiff meets these prima facie requirements, the burden shifts to the defendants to show that the accommodation was either effective or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden. *See Tucker v. State of Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008). Courts may consider, "with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests (namely in maintaining security and order and operating [an] institution in a manageable fashion) when determining whether a given accommodation is reasonable." *See Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008) (*citing Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 487 (7th Cir. 1997)).

---

[8] Likewise, a claim under Section 504 has four elements: 1) a qualified individual with a disability, 2) otherwise qualified for the benefit sought, 3) discriminated against solely by reason of disability, and 4) the program or activity receives federal financial assistance. *Grzan*, 104 F.3d at 119.

The Plaintiff's testimony precludes a claim under the ADA and RA. As to the majority of the Plaintiff's allegations, the Plaintiff was either not denied services due to his disability or the accommodation provided was effective. As detailed above, the Plaintiff was not denied a bed, mattress, food, clothing, laundry, a shower or any services provided by RCJ. While certain aspects of jail life were made more difficult due to the Plaintiff's injury, the Plaintiff was not denied any of these services. In addition, and as detailed above, RCJ repeatedly responded to the Plaintiff's complaints with various accommodations to assist with his physical difficulties.

The only remaining allegation – having an entirely handicap accessible cell – was not accommodated because it would have required a fundamental alteration of RCJ procedures and would have caused administrative burdens. The Plaintiff made numerous requests to be moved to difference housing units. When the Plaintiff first arrived to RCJ, he was placed in "medical segregation" as requested by medical staff. Following repeated requests by the Plaintiff (and with the approval of medical staff), the Plaintiff was eventually moved to the maximum classification "General Population." Thereafter, the Plaintiff began requesting to be moved to the E-wing, a low security dormitory portion of the jail that had more "handicap" accommodations. The Plaintiff was denied housing in the E-Wing for several reasons.

First, the Plaintiff was advised that RCJ rules prohibit the Plaintiff from being housed in this area of the jail for safety and security reasons – specifically, the Plaintiff's serious criminal history and significant disciplinary history resulted in a Level 3 Maximum security classification which prevented him from being housed in a Level 1 Minimum security classification portion of the jail. To allow the Plaintiff to be housed in a low security portion of the jail would have placed both inmates and jail staff at risk. RCJ Defendants did, however, regularly escort the Plaintiff to the E-Wing (intake) shower, which had grab rails.

23

Second, the request was administratively unreasonable and practically unnecessary. Grab rails are not in maximum security cells due to suicide concerns. To require RCJ to install grab rails in any cell the Plaintiff is housed in would have created a serious security concern, not to mention a financial burden. In addition, the Plaintiff testified that, while his injury made it more difficult, he was nonetheless able to get in and out of bed and use the toilet.

The Plaintiff was not denied any services, programs or activities, nor was he discriminated against. There is no evidence that the RCJ Defendant acted against him because of his disability. Quite the reverse, the RCJ Defendants accommodated the Plaintiff's requests unless they were in complete contradiction to fundamental RCJ procedures used to maintain safety and security. Based on the Plaintiff's own testimony, a reasonable jury could not conclude that the RCJ Defendants violated the Plaintiff's rights under the ADA or RA. Both claims must be dismissed.

## VII. Due Process Violation

While States may under certain circumstances create liberty interests that are protected by the Due Process Clause, these interests are generally limited to freedom from restraint that impose atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 483-484 (1995). Simply because pretrial detainees retain certain constitutional rights does not mean these rights are not subject to restrictions and limitations. *Bell*, 441 U.S. at 545. Legitimate goals and policies underlying our penal institution limit these retained constitutional rights and bring about the necessary and justified withdrawal and limitation of many privileges. *Id.* at 546 (*citing Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125 (1977); *Pell v. Procunier*, 417 U.S. 807, 822 (1974)).

Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of pretrial

Case 2:14-cv-00381-PP   Filed 03/21/16   Page 24 of 31   Document 148

detainees. *Bell*, 441 U.S. at 546. Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Id.* at 547 (*citing Jones, supra,* at 128; *Procunier* v. *Martinez*, 416 U.S. 396, 404-405 (1974); *Cruz* v. *Beto*, 405 U.S. 319, 321 (1972); *see Meachum* v. *Fano*, 427 U.S. 215, 228-229 (1976)).

      1.     **Denial of Advocate and Witnesses**

The requirements imposed by the Due Process Clause are flexible and variable dependent upon the particular situation being examined. *E.g., Greenholtz* v. *Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979); *Morrissey* v. *Brewer*, 408 U.S. 471, 481 (1972). In determining what is "due process" in the prison context, we are reminded that "one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff* v. *McDonnell*, 418 U.S. 539, 560 (1974). "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. . . there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 556.

The Supreme Court has held that prisoners have no right to counsel or confrontation of witnesses in disciplinary hearings. *See Baxter v. Palmigiano*, 425 U.S. 308 (U.S. 1976) (*citing Wolff, supra,* at 566). The right of a prisoner to call witnesses is a limited one, available only when permitting so would not have been unduly hazardous to institutional safety or correctional goals. *Ponte v. Real*, 471 U.S. 491, 495 (1985) (*citing Wolff, supra,* at 566; *Baxter, supra,* at 321). "The unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential

Case 2:14-cv-00381-PP   Filed 03/21/16   Page 25 of 31   Document 148

to carrying out the correctional program of the institution." *Baxter*, 425 U.S. at 321. Additionally, "[c]onfrontation and cross-examination present greater hazards to institutional interests." *Wolff*, 418 U.S. at 567 ("If confrontation and cross-examination . . . were to be allowed as a matter of course. . . there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability.") Refusing a prisoner the ability to call a witness may be due to, but is not limited to, "irrelevance, lack of necessity, or the hazards presented in individual cases." *Wolff*, 418 U.S. at 566.

A prison's internal security is a matter left to the direction of prison administrators. *Chapman*, 452 U.S. at 349, n. 14. Although a prison official is required to provide reasons for refusing to call witnesses as requested by an inmate, he is not constitutionally required to place such reasons in writing or otherwise make such reasoning part of the administrative record. *Id.* at 492. A prison official may present such reasons in trial court if a prisoner challenges the disciplinary hearing. *Id.*

It is RCJ policy that an accused inmate may request an administrative hearing on any major rule violation. The inmate is provided the opportunity to be present at the hearing, make a statement and present relevant evidence. A witness may be allowed to testify if it is not cumulative of other evidence and does not threaten the safety or security of the witness or facility. Additionally, a hearing officer may hear testimony of a witness outside the presence of the accused for security purposes. An appeal to a written decision must be submitted in written form within 24 hours.

### A.    Incident #14-000043 involving Nurse Mehring

The Plaintiff has alleged a due process violation related to Incident #14-000043. The Plaintiff requested an advocate, requested to confront Nurse Mehring, and requested two inmate

witnesses: Gerell Rogers and Tyrone Austin. The Plaintiff was provided CO Olk as a staff advocate. Ledezma denied the Plaintiff's request to confront Nurse Mehring because she was unavailable at the time of the hearing. Tyrone Austin was unavailable as a witness because he had transferred out of RCJ by the hearing date. Gerell Rogers was either unavailable or refused to appear. As a result of the disciplinary hearing for Incident #14-000043, the Plaintiff was placed in disciplinary segregation for ten days.

The Plaintiff had no right to a staff advocate or to confront Nurse Mehring regarding this incident. The unavailability of the requested witnesses was outside RCJ Defendants control. All the same, the Court should defer to the discretion of Sergeant Ledezma in handling the Plaintiff's disciplinary hearing. *See Bell*, 441 U.S. at 547 (*citing Jones, supra*, at 128; *Procunier*, 416 U.S. at 404-405; *Cruz*, 405 U.S. at 321; *Meachum*, 427 U.S. at 228-229). The Court must dismiss this claim.

### B. Incident #14-000248 involving CO Noonan

The Plaintiff has alleged a due process violation related to Incident #14-000248. The Plaintiff requested two inmate witnesses: Larviso Brown and Tyrone Austin. The Plaintiff was provided CO Olk as a staff advocate. Sergeant Ledezma asked the Plaintiff if he agreed with the discipline write up as it was written and the Plaintiff stated that he did. Consequently, the Plaintiff was found guilty by admission. Inmate Austin was unavailable as a witness because he was no longer in custody at RCJ at the time of the hearing. Inmate Brown was not called due to the Plaintiff's admission. As a result of the disciplinary hearing for Incident #14-000248, the Plaintiff was placed in disciplinary segregation for fifteen days.

The Court should again defer to the discretion of Sergeant Ledezma in handling the Plaintiff's disciplinary hearing. *See Bell*, 441 U.S. at 547 (*citing Jones, supra*, at 128; *Procunier*,

416 U.S. at 404-405; *Cruz*, 405 U.S. at 321; *Meachum*, 427 U.S. at 228-229). The Court must dismiss this due process claim.

### 2. Placement in Segregation

The Plaintiff alleges that he was denied due process of law when he was placed in disciplinary segregation and when he was denied certain items while in disciplinary segregation. These claims are without merit.

The Supreme Court has held the "Fourteenth Amendment provides to inmates a liberty interest in avoiding placement in more restrictive conditions, such as segregation, when those conditions pose an atypical and significant hardship when compared to the ordinary incidents of prison life." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (*quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Since *Sandin*, the Seventh Circuit has repeatedly held that even conditions that may be "extremely harsh" may not be "so 'atypical' as to create the liberty interest the [Supreme Court] contemplated [in *Sandin*]." *Townsend*, 522 F.3d at 771 (*citing e.g. Lekas v. Briley*, 405 F.3d 602, 609 (7th Cir. 2005); *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1998); *Wagner v. Hanks*, 128 F.3d 1173, 1175-76 (7th Cir. 1997)).

Consistent with the overarching policy that courts permit jail administrators "wide-ranging deference" in executing practices designed to maintain security and order, *Bell*, 441 U.S. at 548, Seventh Circuit precedent reveals that discretionary segregation – segregation imposed for administrative, protective or investigative purposes – is not "atypical," but rather is something inmates should reasonably expect to endure during incarceration. *Townsend*, 522 F.3d at 771. Thus, inmates do not enjoy a protected liberty interest in avoiding placement in such segregated housing. *Id.*; *see also Wagner*, 128 F.3d at 1176 ("Even a prisoner who had committed a white-collar crime and had been assigned to the lowest-security prison in the state's system might find

28

himself in segregation for a nondisciplinary reason"); *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir. 1987) ("Given the broad uses of administrative segregation . . . inmates should reasonably anticipate being confined in administrative segregation at some point in their incarceration"); *Hewitt v. Helms,* 459 U.S. 460, 467-68 (1983) ("There is no constitutional right for inmates to remain out of administrative segregation.").

The Plaintiff received at least six verbal warnings, nine minor violations and twenty-three major violations during his incarceration at RCJ. The major violations resulted in one of the following disciplinary measures: a finding of not guilty, dismissal, loss of privileges or placement in disciplinary segregation.

The conditions within disciplinary segregation are not "atypical" and are conditions that inmates should reasonably expect to endure during incarceration. The practices and policies surrounding disciplinary segregation are designed to maintain security and order within RCJ. This Court should defer to the policies in place at RCJ regarding disciplinary segregation and dismiss this claim against these RCJ Defendants.

## VIII.  Excessive Use of Force

The Plaintiff has alleged that Deputy Nick Koldeway used excessive force when he shouldered the Plaintiff while being escorted to the shower. (Cmplt., pp. 7-8 (DN 1).) The use of force was *de minimis* with no resulting injury. Accordingly, the Plaintiff's claim must be dismissed.

Under Eight Amendment jurisprudence, only "unnecessary and wanton infliction of pain" constitutes actionable conduct. *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (*quoting Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). The applicable inquiry is "'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very

Case 2:14-cv-00381-PP   Filed 03/21/16   Page 29 of 31   Document 148

purpose of causing harm.'" *Whitley*, 475 U.S. at 320-321 (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The Court must examine a variety of factors in conducting this inquiry, including the extent of the injury inflicted. *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 667-668 (7th Cir. 2012) (*citing Whitley, supra* at 321).

While significant injury is not required, as a matter of law, a claim cannot be predicated upon a *de minimis* use of physical force. *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009); *see also, DeWalt v. Carter*, 224 F.3d 607, 619-620 (7th Cir. 2000) (*citing Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992)). Even if an officer's use of force serves no good-faith disciplinary purpose, the force may be so *de minimis* that it does not implicate the Constitution. *Hendricks*, 589 F.3d at 890 (*citing Hudson*, 503 U.S. at 10). The use of *de minimis* force, so long as it "is not of a sort repugnant to the conscience of mankind," is not of Eight Amendment concern. *Hudson*, 503 U.S. at 9-10.

The Plaintiff testified that Deputy Koldeway "dipped his shoulder and ran into" him or "bumped" him following comments he made while passing in the hallway. The Plaintiff testified that CO Pearson, who was escorting him at the time of the incident, prevented him from falling backwards and came between the two. While the Plaintiff's testimony of the incident is a bit different than that documented by Pearson or Koldeway, the Plaintiff did not deny that he did not fall to the ground. Rather, he experienced pain in his wound and went for his regularly scheduled bandage change. The medical record from the date of the incident is unremarkable and the Plaintiff makes no further mention of the incident to medical staff. Taken in the light least favorable to Koldeway, while his actions may not have served a good-faith purpose, it nonetheless qualifies as the kind of *de minimis* use of force that does not constitute cruel and unusual punishment. This excessive force claim is not of the sort that implicates the Constitution and must be dismissed.

Case 2:14-cv-00381-PP   Filed 03/21/16   Page 30 of 31   Document 148

**CONCLUSION**

Wherefore, based on the foregoing, the RCJ Defendants respectfully request that the Court grant their motion for summary judgment and dismiss the Plaintiff's claims in their entirety together with costs and disbursements and any other relief it deems just.

Dated this 21st day of March, 2016.

BASCOM, BUDISH & CEMAN, S.C.

_s/ Jaclyn C. Kallie_____
Timothy A. Bascom
State Bar No. 1010017
Jaclyn C. Kallie
State Bar No. 1088902
Attorney for Defendants Classification
Officer Joshua Evans, Lieutenant Shawn
Barker, Lieutenant Bradley Friend, Sergeant
Melissa A. Gonzales, Deputy Nick
Koldeway, Sergeant Porfirio Ledezma,
Sergeant Melissa Moran, Patrick Noonan,
Sheriff Christopher Schmaling and
Captain Douglas Wearing

2600 North Mayfair Road, Suite 1140
Wauwatosa, WI 53226
(414) 476-0800

31