UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TARENCE BANKS,

                Plaintiff,

                                      Case No. 14-cv-381-pp

     v.

LESLIE PATTON, et al.,

                Defendants.

---

## DECISION AND ORDER GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 146, 152)

---

     Plaintiff Tarence Banks is representing himself.[1] On May 27, 2014, Judge Lynn Adelman screened the complaint under 28 U.S.C. §1915A. He permitted the plaintiff to proceed on Fourteenth Amendment conditions of confinement and deliberate indifference to a serious medical need claims regarding the conditions at the Racine County Jail (RCJ) and the alleged failure to treat his wound as directed; due process claims related to disciplinary hearings which resulted in segregation stays[2]; and an excessive force claim based on the allegation that defendant Koldeway shouldered the plaintiff, causing injury. Dkt. No. 8 at 5. On December 30, 2014, the clerk of court reassigned the case to this court. Almost nine months later, after the plaintiff

---

[1] The court recruited counsel to represent the plaintiff during an evidentiary hearing to determine whether he had exhausted the available administrative remedies prior to filing this lawsuit. Counsel's representation of the plaintiff was limited to that hearing. Dkt. No. 191.

[2] In response to the defendants' motion for summary judgment, the plaintiff agreed to waive his due process claims. Dkt. No. 173 at 8. This decision does not address the due process claims for that reason.

1

sent the court a letter asking for clarification of Judge Adelman's screening order, dkt. no. 51, the court also allowed the plaintiff to proceed on claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA). Dkt. No. 67 at 10.

On March 21, 2016, defendants Barker, Friend, Gonzales, Koldeway, Ledezma, Moran, Noonan, Evans, Schmaling and Wearing (the RCJ Defendants) filed a motion for summary judgment. Dkt. No. 146. That same day, the remaining defendants—Coe, Gone, Mehring, and Patton (the Medical Defendants)—also filed a motion for summary judgment. Dkt. No. 152. Once the parties had fully briefed those motions, the court began to evaluate them. The court noted that both sets of defendants had argued that the court should dismiss the plaintiff's case because he had failed to exhaust the available administrative remedies before filing his lawsuit, as required by the Prison Litigation Reform Act. On August 2, 2016, the court held an evidentiary hearing to examine whether the defendants' exhaustion arguments had merit.

As explained below, the court concludes that it must dismiss aspects of the plaintiff's conditions of confinement and ADA/RA claims, and his deliberate indifference claims, because he failed to exhaust the available administrative remedies with regard to those claims. The court also concludes that the RCJ Defendants are entitled to summary judgment on the plaintiff's remaining claims.

# I.    FACTS[3]

The plaintiff has sued fourteen defendants. The plaintiff's medical claims are directed at four of the defendants (Coe, Patton, Mehring and Gone—the Medical Defendants), who, during the relevant time, were employed by Correctional Healthcare Companies to provide healthcare services to inmates at RCJ. Dkt. No. 154 at ¶13. The plaintiff's remaining claims are directed at one or more RCJ officials (Schmaling, Koldeway, Noonan, Gonzales, Moran, Barker, Friend, Evans, Wearing, and Ledezma—the RCJ defendants).

## A.    The Plaintiff's Allegations

The plaintiff is an amputee; he lost his arm one month prior to his November 12, 2013 confinement at the RCJ. Dkt. No. 1 at 6; Dkt. No. 154 at ¶6. The plaintiff was housed in an intake cell for his first five days at RCJ. Dkt. No. 1 at 6. According to the plaintiff, the cell was not handicap-accessible; it did not have bed or wall rails. Id. As a result, the plaintiff alleges that he urinated on himself several times because he could not make it out of bed to the toilet. Id. The plaintiff pressed the cell's emergency call button numerous times for help, but never received a response. Id. Three days into his stay, the plaintiff asked how long he had to remain in the cell, and defendant Evans said

---

[3] The court takes the facts from the plaintiff's sworn complaint (Dkt. No. 1), "Proposed Findings of Fact of Defendants Leslie Patton, Bill Coe, and Dana Mehring, and Nurse Practitioner Mahita Gone in Support of their Motion for Summary Judgment" (Dkt. No. 154), "Proposed Findings of Fact" (Dkt. No. 147), "Response to Plaintiff's Supplemental Proposed Findings of Fact" (Dkt. No. 186), "Reply to Plaintiff's Response to RCJ Defendants' Proposed Findings of Fact" (Dkt. No. 185), and "Medical Defendants' Reply to Plaintiff's Response to Medical Defendants' Proposed Findings of Fact" (Dkt. No. 182). Where the plaintiff failed to dispute the defendants' proposed facts, the court deems those facts admitted for the purpose of deciding summary judgment. Civ. L. R. 56(b)(4).

they hadn't figured out where to put him yet. Id. The plaintiff told Evans that he had urinated on himself. Id.

The plaintiff alleges that after five days in the intake cell, he was transferred to "Med/Seg," which also was not handicap-accessible. Id. The plaintiff's cellmate helped him with many tasks, such as putting on deodorant, cleaning the cell, putting his clothes in the laundry bag and changing the bandage on his back injury. Id. at 7. The cellmate, however, "charged" the plaintiff with food from his meal tray in exchange for the help, so the plaintiff "starved" at times. Id.; Dkt. No. 147 at ¶17.

The plaintiff states that his mobility during this time was very limited, and he couldn't walk more than a few feet. Dkt. No. 1 at 7. He states that he needed a wheelchair for long distances. Id. The plaintiff's cellmate also had to help him get in and out of bed, and sometimes helped him get off of the toilet. Id. When the plaintiff asked Evans where the handicap-accessible cells were, Evans replied that they were on the other side of RCJ, but that "[defendant] Patrick Noonan states you will never see that side!" Id. at 8.

The plaintiff states that he was on a shower restriction. Id. The RCJ Defendants explain that the plaintiff's doctor did not want him to get his bandages wet. Dkt. No. 147 at ¶24. Once the doctor approved the plaintiff for showers, the RCJ Defendants told him to use the dayroom shower, which is available daily from 6:00 a.m. to 8:00 a.m. and from 8:00 p.m. and 10:00 p.m. Dkt. No. 147 at ¶26. The plaintiff complained that the dayroom shower had no handrails or bars, so the RCJ Defendants provided the plaintiff with a chair.

Dkt. No. 1 at 8; Dkt. No. 147 at ¶27. The plaintiff states that he fell off the chair staff gave him to use. Dkt. No. 1 at 8. After the plaintiff requested the use of a handicap-accessible shower, the RCJ Defendants began to escort him downstairs to use the intake shower, which had handrails. Dkt. No. 1 at 8; Dkt. No. 147 at ¶28. A chair was placed in that shower at the plaintiff's request, but it was the same type of chair from which he had fallen when he was upstairs. Dkt. No. 1 at 8; Dkt. No. 147 at ¶29. After about two months, the plaintiff received a medical shower chair, but staff removed the handrails from the chair, which the plaintiff says rendered it useless. Dkt. No. 1 at 9.

The plaintiff also states that he was not allowed to shower regularly. Id. The RCJ Defendants explain that they offered him a shower at least three times each week in the handicap accessible shower, and that he went, at most, five days without a shower. Dkt. No. 1 at 9; Dkt. No. 147 at ¶30-31. They also explain that the plaintiff often would refuse the opportunity to shower. Dkt. No. 147 at ¶31. The plaintiff states that he developed a rash as a result of the infrequent showers. Dkt. No. 1 at 9.

The plaintiff also states in his complaint that an outside doctor ordered that the plaintiff needed "wet to dry dressing change[s]." Id. He says the gauze was supposed to be wetted, the wound wiped, and the wet gauze fitted into the wound, but that this did not happen on a regular basis. Id. The Medical Defendants disagree, stating that during the eighteen days in November 2013 that the plaintiff was at RCJ, medical staff changed his dressings at least

fourteen times; and that during December 2013, they changed his dressing at least twenty-two times. Dkt. No. 154 at ¶27-28.

The plaintiff alleges that as a result of the infrequent bandage changes, he developed an infection in his arm and back, dkt. no. 1 at 9, but the Medical Defendants maintain that the plaintiff's arm and back were infected when he arrived at RCJ, dkt. no. 154 at ¶15-16. Regardless of when the infection developed, the plaintiff states that, when he asked defendant Patton, who had been assigned to help him wash his arm and back, for assistance, she refused, causing him to develop a rash (in addition to the infection) on his arm and back. Dkt. No. 1 at 10. The plaintiff states that he was given a cream for the rash, but that he couldn't put it on, so he had to rely on his cellmate. Id. Patton, on the other hand, states that on November 20, 2013, she notified Gone that the plaintiff's wound was draining, and that she cleaned the wound and applied ointment with a bandage. Dkt. No. 154 at ¶29. Gone prescribed antibiotics on November 20 and again on December 4, 2013, after Patton reported that the wound was still draining. Id. at at ¶30.

On January 2, 2014, the plaintiff refused to let defendants Patton or Coe look at or treat his arm and back. Dkt. No. 1 at 12; Dkt. No. 154 at ¶32. The Medical Defendants state that they provided the plaintiff with bandages and told him how to change the dressing himself. Dkt. No. 154 at ¶35. The plaintiff states that, because of his refusal to let them change his bandages, he was placed in intake and all of his personal belongings were removed. Dkt. No. 1 at

12. He states that a few days later, he let them see the area, but they did not provide any treatment. Id.

The plaintiff eventually told RCJ staff that he felt healthy enough to be transferred to general population, so on January 13, 2014, RCJ staff transferred him to a cell in a Level 3 maximum security pod (according to the RCJ Defendants, the plaintiff was classified at the highest custody classification because of his criminal history and past confinement). Dkt. No. 147 at ¶44, 49. The plaintiff's new cell was not handicap-accessible. Dkt. No. 1 at 11; Dkt. No. 154 at ¶36. The RCJ Defendants explain that cells and dayroom showers for Level 3 Maximum inmates do not contain grab rails for safety and security reasons, including suicide concerns. Dkt. No. 147 at ¶46.

In the plaintiff's new cell, the plaintiff did not have assistance from an inmate. Dkt. No. 1 at 11. He had trouble opening the Ziploc food bag for meals, and his food went flying to the floor. Id. After this happened numerous times and the plaintiff wasn't given replacement food, the RCJ staff began to give him Styrofoam food trays. Id.; Dkt. No. 147 at ¶42. The plaintiff also had trouble tying his laundry bag and making his bed. Dkt. No. 1 at 12; Dkt. No. 147 at ¶20, 22. The plaintiff asked defendant Wearing when he could be fitted for a prosthetic arm, but Wearing responded only that RCJ would not pay for it. Dkt. No. 1 at 11. The RCJ Defendants explain that no medical professional ever prescribed a prosthetic for the plaintiff because his other (dominant) arm was functioning. Dkt. No. 147 at ¶37.

The plaintiff began to request that he be transferred to E-wing, which is a low security dormitory portion of RCJ that is newer and has more handicap accommodations, including shower grab rails. Id. at ¶50. RCJ denied the plaintiff's movement request for security reasons; however, it continued to let him use the showers in that area. Id.

In February 2014, the plaintiff was placed in disciplinary segregation for twenty-five days, during which time his mattress was removed from 8:00 a.m. until 8:00 p.m. daily, pursuant to RCJ policy. Dkt. No. 1 at 10, 16; Dkt. No. 147 at ¶39-40. He complained (it is unclear to whom) about the pain from having to sit on concrete during the day, but was told (again, it is unclear by whom) that he needed to pay $7.00 for Tylenol. Dkt. No. 1 at 10. The plaintiff also inquired of defendants Patton, Coe, Wearing, Gonzales, Moran, Friend and Barker about the removal of his medically-approved extra mattress, extra blanket, and compression socks, but he received no response. Dkt. No. 1 at 10, 15, 16, 19. The RCJ Defendants explain that inmates in segregation are allowed to retain hygiene items, including a blanket, and that, when the plaintiff was in segregation, he was not prescribed an extra blanket or compression socks. Dkt. No. 147 at ¶40-41.

At some unspecified point, while an officer (not a defendant) escorted the plaintiff to his shower, defendant Koldeway was walking nearby. Dkt. No. 1 at 12. The plaintiff told the officer that Koldeway was the reason his bandages weren't getting changed. Id. At that point, the plaintiff alleges, Koldeway threw his shoulder into the plaintiff and tried to knock him down. Id. The plaintiff

8

states that the officer stopped the plaintiff from falling. Id. The plaintiff states that he was taken to medical and prescribed antibiotic cream for an abrasion and ibuprofen for pain. Id. at 13.

## II. DISCUSSION

### A. Exhausting Available Administrative Remedies

According to the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Various important policy goals give rise to the rule requiring administrative exhaustion, including restricting frivolous claims, giving prison officials the opportunity to address situations internally, giving the parties the opportunity to develop the factual record, and reducing the scope of litigation. Smith v. Zachary, 255 F.3d 446, 450-51 (7th Cir. 2001).

The RCJ Inmate Handbook provides that, when prisoners have a basis for a grievance or complaint and informal resolution is not possible, a prisoner should submit a written complaint to the jail administrator. Dkt. No. 147 at ¶3. If a prisoner is dissatisfied with a response, he may submit an appeal in writing to the jail administrator within fifteen days of receiving the response. Id. at ¶5.

If a court determines that an inmate failed to complete any step in the exhaustion process prior to filing a lawsuit, the court must dismiss the plaintiff's complaint. Perez v. Wis. Dept. of Corrs., 182 F.3d 532, 535 (7th Cir. 1999) ("[A] suit filed by a prisoner before administrative remedies have been

exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits.").

## 1. The Parties' Arguments

According to the RCJ Defendants, the plaintiff filed at least sixty inmate grievances from November 12, 2013, until April 3, 2014 (the day he filed his federal lawsuit). Dkt. No. 147 at ¶6. They state that the plaintiff did not appeal any of his grievances. Id. at ¶7.

The court held the evidentiary hearing on August 2, 2016, to determine whether the defendants could carry their burden and establish that the plaintiff had not exhausted the available administrative remedies. At the hearing, the plaintiff conceded that he had not appealed many of his grievances, and testified that there were a couple of reasons for this.

First, the plaintiff testified that he did not receive responses to the majority of his grievances. The plaintiff explained that Wearing was the only RCJ Defendant who ever responded, and that he responded only to some, not all, of the grievances the plaintiff addressed to him. The plaintiff did not know how many responses he had received or when exactly he had received them, but he said the first time he saw many of the responses in his jail file was after he filed this lawsuit and he requested a copy of the file through discovery. In short, the plaintiff argued that he could not appeal decisions or responses that he never received.

Second, the plaintiff argued that he was unaware of the appeal process. He explained that, when he arrived at RCJ, he was in bad physical shape. His

arm recently had been amputated, and because of a bone graft (done in an attempt to save his arm), he had long incisions on his arm, back and legs. He said he could not get out of bed without significant assistance. At that time, the pages of the RCJ Handbook explaining the grievance and appeal procedures were posted on the dayroom windows. The plaintiff explained that he was unable to leave his cell to get to the dayroom. The plaintiff argued that he could not take advantage of an appeal procedure that he did not (and could not) know about.

The RCJ Defendants responded that, even if the plaintiff was in bad shape when he arrived at RCJ *this time*, he had been housed at RCJ at least forty-five times since 1997. The handbook was available on the dayroom walls on each of those occasions. In addition, they argued that the plaintiff's mobility issues resolved long before he filed his lawsuit, as evidenced through his reassignment to general population and his lengthy disciplinary history while at RCJ, which included physical altercations with other inmates.

The RCJ Defendants also argued that the plaintiff had filed multiple, redundant complaints to various people. The RCJ Defendants contend that they responded to every *topic* the plaintiff complained about (either in writing or by giving the plaintiff what he requested), if not to every *complaint*. They argued that it would have been a waste of time and resources to address each and every complaint, because in many instances the topics of the redundant complaints already had been addressed by the person best suited to respond.

Finally, the RCJ Defendants explained that an inmate who desires to appeal a decision on a complaint can do so by using the same form on which he files a complaint. In explaining how a complaint can be distinguished from an appeal of a complaint (given that they may be filed on the same form), the RCJ Defendants stated that an inmate must make reference the decision/response he is appealing. This requirement is not stated in the RCJ Handbook.

### 2.    The Court's Analysis

The parties agree that the plaintiff filed a lot of complaints during the five months between his incarceration and the filing of his complaint. The sheer number of complaints, many of which were redundant, coupled with RCJ's informal and disorganized filing system, made it difficult for the parties and the court to track which complaints the RCJ staff responded to, which they ignored, and which, if any, the plaintiff appealed. The difficulty in tracking the complaints was further compounded by the plaintiff's inconsistent and imprecise recollection of which complaints he received responses to and when he received them.

The RCJ Defendants' argument that they have carried their burden because none of the many complaints contained the word "appeal," or specifically reference a prior response, is too simplistic. Such an argument has merit only if: (1) the RCJ Defendants responded to the complaints in the first place so that there was something for the plaintiff to appeal; and (2) it was clear to the plaintiff that he needed to include the word "appeal," or specifically

reference a prior response for his subsequent complaint, to identify something as an appeal. Neither of those factors is as clear-cut as the RCJ Defendants imply.

But the plaintiff's argument that the administrative remedies were not adequately communicated to him and therefore were not available is not credible. Although the plaintiff had difficulty moving around when he first arrived at RCJ in November 2013, it appears from the testimony that his mobility returned months before he filed this lawsuit. Even if he was unable to get to the dayroom to see the posted handbook initially, that situation did not last long. In addition, the RCJ Defendants explained that the plaintiff had been at RCJ numerous times before—so many, in fact, that the plaintiff couldn't even offer a precise number. Given that he had access to the RCJ Handbook on those prior occasions, his argument that the policy was not communicated to him doesn't pass muster.

With regard to the evidence presented at the hearing, the RCJ Defendants provided a "sample" of the complaints and responses they assert were sent to the plaintiff; however, they did not perform the tedious task of organizing all of the complaints by claim and showing whether, when, and how the RCJ Defendants responded. Given that the plaintiff cannot appeal a decision he never received, the RCJ Defendants needed to demonstrate that the lack of an appeal was because of the plaintiff's failure to avail himself of the available administrative remedies, and not because the RCJ Defendants effectively prevented him from doing so by never responding to him.

The court reviewed the copies of the complaints and responses provided by the plaintiff and the RCJ Defendants. Because the plaintiff testified that he received many of the responses only after he had filed his lawsuit (*i.e.,* months after he had made the complaint), and because the RCJ Defendants did not establish when or whether any of the responses were delivered to the plaintiff, the court disregarded any response that was not dated or signed. In addition, because the plaintiff testified that Captain Wearing was the only RCJ Defendant to respond to his complaints, the court credited only those responses that were signed and dated by Wearing. With these parameters in mind, the court concludes the following:

      *a.    Shower Complaints*

The plaintiff filed repeated complaints to multiple people about the housing unit showers not being handicap-accessible and the fact that he had to use the intake showers (which have grab rails) and was not allowed to shower daily. <u>See</u> Dkt. No. 194, Ex. 1003A, BANKS 067, 071, 110, 112, 115; Pl's. Ex. 2, TB 002; Pl's. Ex. 8, TB 008; Pl's. Ex. 12, TB 0012. The first of the complaints on these topics is dated December 13, 2013 (<u>Id.</u>, at Ex. 1003A, BANKS 067); the last of the complaints on these topics (prior to the plaintiff's lawsuit) is dated March 26, 2014 (<u>Id</u>. at Ex. 1003A, BANKS 115). On March 28, 2014, Wearing responded to the plaintiff's complaint, explaining that the posted shower times were only for the housing unit showers, but that the intake shower that the plaintiff uses is available all day, every day. <u>Id</u>. Wearing

also highlighted that the plaintiff had pointed out that he was entitled to a shower three times per week versus a shower every three days. Id.

The defendants assert that the plaintiff did not appeal this response (they assert generally that the plaintiff did not appeal *any* response). The plaintiff did not rebut this assertion with evidence, and the court was not able to find any complaint (let alone an appeal) filed between March 28, 2014, and April 3, 2014 (the date the plaintiff filed his complaint). The court concludes that the plaintiff did not exhaust the available administrative remedies with regard to his claims that: (1) the housing unit showers were not handicap-accessible; (2) he had to use the intake showers; and (3) he was not able to take a shower daily even though the inmates using the housing unit showers were given this option. The court will dismiss these claims without prejudice.

> b. *Medical Care Complaints*

Although the Medical Defendants did not present evidence at the evidentiary hearing, they argued in their motion for summary judgment that only two of the many complaints the plaintiff filed can be said to relate to the treatment of his arm wound: one he filed on February 7, 2014, and one he filed the next day. Dkt. No. 153 at 13. The Medical Defendants assert that both complaints were denied by a jail captain (Wearing) on February 12, 2014, and that the plaintiff did not appeal that denial. Id.

A review of the complaints provided reveals that the plaintiff filed complaints about the treatment of his arm on December 12, 2013 and December 16, 2013. Dkt. No. 194, Pl's. Ex. 4, TB 004; Ex. 1005, Dkt. No. 176-

1 at 6. The court could find no responses to these complaints from anyone at RCJ, although defendant Friend testified at the evidentiary hearing that complaints about medical issues are generally forwarded to the medical staff. The plaintiff filed similar complaints on February 6 and 7, 2014; these complaints were directed to a different RCJ Defendant and they did not reference his prior complaints or the lack of response to those complaints. Dkt. No. 194, Ex. 1003A, BANKS 096. On February 12, 2014, Wearing responded to the two February complaints, informing the plaintiff that he had spoken with medical and that they had stated that they had showed the plaintiff how to address his issues. Id. The court did not find any other complaints dealing with issues related to the plaintiff's medical care.

The Medical Defendants assert that the plaintiff did not appeal Wearing's February 12 response, and the plaintiff did not rebut this assertion with evidence. The court was not able to find any complaint (or appeal) filed between February 12, 2014, and April 3, 2014 (the date the plaintiff filed his complaint). The court concludes that the plaintiff did not exhaust the available administrative remedies with regard to his claim that the Medical Defendants were deliberately indifferent to his serious medical needs, and the court will dismiss this claim without prejudice.

c.    *Excessive Force*

On January 7, 2014, the plaintiff submitted a complaint stating that Koldeway had "turn[ed] around and come at [him] real aggressive and threw his body into [the plaintiff's] body causing [him] to fall backward. C/O Pearson had

16

to put his hand behind [the plaintiff] to stop [him] from falling, and use the other hand to stop Deputy Kol[d]eway from coming at [him.]" <u>Id.</u>, Ex. 1003A, BANKS 254. On January 13, 2014, someone (the signature is unreadable) responded, "The incident is being investigated . . . ." <u>Id</u>. The plaintiff testified at the hearing that he did not receive any other response, and the RCJ Defendants do not argue that they ever communicated the results of the investigation or otherwise updated the plaintiff in response to his complaint.

The court concludes that this response was insufficient to trigger the plaintiff's obligation to appeal, because there was no decision to appeal. In essence, the RCJ Defendants told the plaintiff that they were in the process of making a decision on how to respond to his complaint, but never told him the outcome. It would be unfair to prevent the plaintiff from pursuing his lawsuit because he failed to appeal a decision he never received. Because the administrative remedies were not available to the plaintiff with regard to this particular claim, he may proceed with his excessive force claim.

### d. *Handicap-Accessible Cell*

Based on the parties' submissions to the court, it appears that the plaintiff complained about not being held in a handicap-accessible cell on December 2, 8, and 17. <u>See</u> <u>Id.</u>, Pl's Ex. 2, TB 002; Ex. 8, TB 008; Ex. 1003A, BANKS 070. An undated response to his December 17 grievance states, "You are placed through classification. You are provided showers in Intake, in a handicap accessible shower." <u>Id.</u>, Ex. 1003A, BANKS 070.

On December 30, 2013, the plaintiff sent a complaint to the sheriff repeating his request for an answer as to why he was not being housed in a handicap-accessible cell. Id., Pl's. Ex. 6, TB 006. There is no indication that the sheriff responded to this complaint. On the same day, the plaintiff sent the same complaint to Wearing. There is no indication that Wearing responded to this complaint. The court could not find (and the parties did not identify) any other requests or responses on this topic.

The court finds that, assuming the plaintiff received the response to his December 17 complaint, he attempted to appeal this response by escalating the complaint to the sheriff on December 30. Although the plaintiff did not reference the response and although the plaintiff did not specifically use the word "appeal" in his complaint, the court finds that, based on the lack of specificity in the RCJ Handbook on the appeal process, the plaintiff's attempt to move his complaint up the ladder to a person with greater authority is sufficient to satisfy the appeal requirement. Further, assuming the plaintiff did not receive the undated response to his December 17 complaint, the court finds that the plaintiff is relieved of his obligation to appeal because the RCJ Defendants never provided the plaintiff with a response to appeal. The court concludes that the plaintiff may proceed with his claims relating to him not being moved to a handicap accessible cell.

e.    *The Removal of Medically-Approved Items while in Segregation, the Use of a Food Tray, and the Prosthetic Arm*

The plaintiff alleges in his complaint that his medically-approved property items—including an extra mattress, compression socks, and an extra blanket—were taken from him while he was in disciplinary segregation for twenty-five days. The plaintiff also complains that the single mattress he was allowed was removed from his cell between 8:00 a.m. and 8:00 p.m., pursuant to RCJ policy. The court reviewed the copies of the grievances submitted by the parties and could not locate any grievance that the plaintiff submitted on this topic. Because the plaintiff did not submit a grievance, he did not avail himself of the available administrative remedies, and the court will dismiss these claims.

The plaintiff also alleges that the RCJ Defendants refused to schedule an appointment for him to be fitted for a prosthetic arm. The plaintiff complained about this refusal on January 18, 2014. Id., Ex. 1003A, BANKS 089. Wearing responded on January 30, 2014. Id. On February 27, 2014, the plaintiff wrote to the sheriff to complain about the response he had received. Id., Ex. 1003A, BANKS 108. The plaintiff's attempt to escalate his complaint up the RCJ hierarchy is sufficient to establish that the plaintiff exhausted his administrative remedies on this claim. The plaintiff may proceed on this claim.

Finally, the plaintiff complained on January 19 and February 3, 2014, that he was unable to open the Ziploc-bagged meals, and that RCJ staff refused to provide him meals on a Styrofoam tray despite his requests. Id., Pl's.

Ex. 9, TB 009; Pl's. Ex. 10, TB 010. The defendants state that they responded to the plaintiff's complaints by giving him what he asked for: his meals on a Styrofoam tray. While this may be relevant to the determination of the merits of the plaintiff's claim, it is irrelevant to the determination of whether the plaintiff exhausted his administrative remedies. In short, the RCJ Defendants did not provide a written response to the plaintiff's complaint. In failing to do so, the RCJ Defendants effectively prevented the plaintiff from filing an appeal (because there was nothing to appeal). The plaintiff may proceed with this claim.

To summarize, the court will dismiss the following claims without prejudice based on the plaintiff's failure to exhaust the available administrative remedies prior to filing his lawsuit: (1) the ADA/RA and conditions claims relating to handicap-accessibility issues with the shower and the frequency with which he was permitted to shower; (2) the deliberate indifference claims against the Medical Defendants; (3) the conditions of confinement and deliberate indifference claims relating to the removal of his medically-approved property while he was in disciplinary segregation; and (4) the conditions of confinement claim relating to the removal of his mattress during the day while he was in disciplinary segregation.

Because the parties have fully briefed the merits of the remaining claims, the court will proceed to determine whether, as a matter of law, the RCJ Defendants are entitled to summary judgment on the following claims: (1) the excessive force claim; (2) the ADA/RA and conditions of confinement claims

relating to the handicap accessibility of the plaintiff's cell and the presentation of the plaintiff's meals in Ziploc bags; and (3) the deliberate indifference claim relating to the RCJ Defendants' failure to schedule the plaintiff for an appointment to fit a prosthetic arm.

B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### 1. Excessive Force

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishments. Where prison officials are accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). Several factors are relevant in making that determination, including the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate. Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004) (citing DeWalt v. Carter, 224 F.3d 607, 619 (7th Cir. 1999)).

A discernable injury is not required to sustain an Eighth Amendment excessive force claim, for "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated" and "[t]his is true whether or not significant injury is evident." Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9). However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. (quoting Hudson, 503 U.S. at 9). An excessive force claim cannot be predicated on a *de minimis* use of force. Fillmore, 358 F.3d at 504. "Thus, not

every push or shove by a prison guard violates a prisoner's constitutional rights." DeWalt, 224 F.3d at 620 (citing Hudson, 503 U.S. at 9). "Even if an officer's use of force serves no good-faith disciplinary purpose, the force may be so '*de minimus*' that it does not violate the Eighth Amendment." Hendrickson v. Cooper, 589 F.3d 887, 890 (7th Cir. 2009) (citations omitted).

The plaintiff states that, after he pointed at Koldeway and made a harmless comment, Koldeway "threw his shoulder into [him] trying to knock [him] down." Dkt. No. 1 at 12. The plaintiff stumbled backwards, but another officer steadied the plaintiff and kept him from falling down.

Koldeway's act of shoving or bumping into the plaintiff qualifies as the kind of *de minimus* use of force that does not constitute cruel and unusual punishment. See DeWalt, 224 F.3d at 620. The contact "was a single and isolated act, unaccompanied by further uses of force." Id. Further, although the plaintiff states that he experienced pain in his wound, the shove does not appear to have caused serious injury. Although the court "does not condone the unjustified use of force by prison guards," the plaintiff's statements about Koldeway's use of force against him—even viewed in the light most favorable to him—fall short of what is required to establish a claim for excessive force under the Eighth Amendment. Accordingly, Koldeway is entitled to summary judgment, and the court dismisses this claim.

### 2. Conditions Claim Relating to the Plaintiff's Cells and Food.

As a pretrial detainee, the plaintiff's claims arise under the Due Process clause of the Fourteenth Amendment instead of the Eighth Amendment's Cruel

and Unusual Punishment clause, which applies to convicted prisoners. Jackson v. Ill. Medi-Car, Inc., 300 F.3d 760, 764 (7th Cir. 2002). The distinction is one without a difference here, because the claims are analyzed under the same standard. Whiting v. Marathon Co. Sheriff's Dept., 382 F.3d 700, 703 (7th Cir. 2004).

Prison conditions can be considered cruel and unusual punishment if they are so severe that they deny an inmate "the minimal civilized measure of life's necessities." Hudson v. McMillian, 503 U.S. 1, 20 (1992); Gillis v. Litscher, 468 F.3d 488, 491 (7th Cir. 2006). To state a claim that his constitutional rights were violated, a plaintiff must show that: (1) the prison conditions were serious enough to deny him of basic human needs; and (2) the officers acted with a culpable state of mind, which at the minimum level, requires "deliberate indifference." McNeil v. Lane, 16 F.3d 123, 124 (7th Cir. 1993).

The plaintiff explains that the RCJ Defendants housed him in cells that did not contain bed rails or wall rails and that, as a result, he had difficulty getting in and out of bed and using the toilet. The plaintiff also explains that he had difficulty eating his meals because they were delivered in Ziploc bags instead of on a tray. The RCJ Defendants do not dispute these allegations. Instead, they argue that, even assuming the allegations are true, the plaintiff has failed to establish a violation of the Constitution as a matter of law. The court agrees.

The Court of Appeals for the Seventh Circuit has explained that "[a]dequate food and facilities to wash and use the toilet are among the

'minimal civilized measure of life's necessities.'" <u>Jaros v. Illinois Dept. of Corrections</u>, 684 F.3d 667, 670 (7th Cir. 2012) (citations omitted). The court has clarified, however, that to state a violation of the Constitution, a plaintiff must allege that he was *deprived* of these things, not just that his use of, or access to, them was difficult. <u>Id</u>. at 671.

The plaintiff has not alleged that he was deprived the use of a bed or toilet; he alleges only that his use of them was more difficult because the cell did not contain grab bars. Similarly, while the plaintiff had difficulty opening the Ziploc bags of food—and on occasion, chose to give his food away in exchange for help, or spilled his food on the ground and therefore didn't eat it— he does not allege that the missed meals endangered his health, or that the RCJ Defendants denied him food. Because the facts the plaintiff alleged, even viewed in the light most favorable to him, do not give rise to a constitutional violation, the court will dismiss this claim.

### 3. ADA/RA Claim Relating to the Plaintiff's Cells and Meals

To establish a violation of Title II of the ADA, "the plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." <u>Wagoner v. Lemmon</u>, 778 F.3d 586, 592 (7th Cir. 2015) (quoting <u>Love v. Westville Corr. Ctr.</u>, 103 F.3d 558, 560 (7th Cir. 1996)); <u>see</u> <u>also</u> 42 U.S.C. §12132. Analysis under the ADA and the RA is essentially the same, except that the RA includes an additional

element requiring that the entity denying access be a recipient of federal funds. Jaros v. Illinois Dept. of Corrections, 684 F.3d 667, 671-72 (7th Cir. 2012). The relief available to the plaintiff under each Act is coextensive. Id. at 672. The RCJ Defendants have conceded that, for purposes of their summary judgment motion, the minor differences between the ADA and RA are irrelevant. Dkt. No. 148 at 21. Thus, as one claim succeeds or fails, so does the other, and for brevity, the court will refer only to the ADA going forward.

The court makes one final acknowledgment before discussing the merits of the plaintiff's claim: that is, "because the ADA addresses its rules to employers, places of public accommodation, and other organizations, not to the employees or managers of these organizations," the proper defendant is RCJ. Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000) (overruled on other grounds). The plaintiff has sued the RCJ Defendants, including Sheriff Christopher Schmaling, in both their official and individual capacities. Because they are sued in their official capacities, each of those defendants stands in as a proxy for RCJ. Id. None of them can be held *personally* liable on these claims. Id. Further, this is the *only* official capacity claim that the plaintiff states. All other claims are against the RCJ Defendants in their individual capacities only. See Hill v. Shelander, 924 F.2d 1370, 1372 (7th Cir. 1991).

For the plaintiff to prevail on his ADA claim, he must establish that RCJ denied him the benefits of services, programs, or activities and that they did so because of his disability. Jaros, 684 F.3d at 672. Courts have held that access to toilet facilities and meals is considered a program or activity within the

meaning of the ADA. Id.; <u>Phipps v. Sheriff of Cook Cnty.</u>, 681 F.Supp.2d 899, 916 (N.D. Ill. 2009). "Public entities, such as correctional facilities, must 'take reasonable measures to remove architectural and other barriers that deny access to such services. <u>Clemons v. Dart</u>, Case No. 13-C-2356, 2016 WL 890697 at *4 (N.D. Ill. Mar. 9, 2016) (citations omitted).

The plaintiff explains that RCJ denied him the benefits of services and programs because he was housed in cells that did not comply with ADA structural requirements (*i.e.,* there were no grab bars by the bed or toilet). He states that on several occasions when no one was available to help him, he did not make it to the toilet on time and urinated on himself.

The plaintiff does not state that once his leg healed from surgery and he was able to move more easily that he continued to be unable to get in and out of bed or on and off the toilet. In fact, the plaintiff's many requests to be moved to a "handicap accessible" cell in E-wing never explained why he needed the grab bars; he simply argued that he was entitled to a "handicap accessible cell" because he has only one arm.

The RCJ Defendants explain that the plaintiff made numerous requests to be moved out of different housing units. Dkt. No. 148 at 23. For the first five days, the plaintiff was housed in an intake cell while RCJ decided where to place him. RCJ then moved him to "medical segregation" at the request of medical staff. Id. Following the plaintiff's requests to be moved out of medical segregation, the RCJ Defendants moved him (with the medical staff's approval) to the maximum classification "General Population." Id. At that point, the

plaintiff began to request a move to the E-wing, which is a low security dormitory portion of RCJ that has more "handicap" accommodations. Id. RCJ denied these requests.

The court finds that the RCJ Defendants are entitled to summary judgment because "there was no reasonable accommodation that would have entitled the plaintiff to participate in the programs or services that he complains about being excluded from." See Crawford v. Indiana Dept. of Corrections, 115 F.3d 481, 487 (7th Cir. 1997) (overruled on other grounds).

First, the plaintiff states that for the first five days he was at RCJ he experienced extreme difficulty in getting out of bed and using the toilet. He states that he needed help to do either, and urinated on himself several times because he wasn't able to get to the toilet in time. RCJ then moved the plaintiff to medical segregation, where the plaintiff says he could only move a few feet at time without help. He states he needed help getting out of bed and "sometimes" he needed help moving off the toilet. Once the plaintiff healed from his surgeries, he was moved to another cell in general population. The plaintiff does not state that he needed help in and out of bed or on and off the toilet once he was in general population.

The court finds that the plaintiff's difficulties in getting out of bed[4] and getting to the toilet appear to have been a result of the fact that he was recovering from surgery, and not a result of his disability. Once the plaintiff

_____

[4] It is questionable whether having easy access to one's bed is a "program" or "activity," but the court need not make that determination here. See Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("But incarceration, which requires the provision of a place to sleep, is not a "program" or "activity." Sleeping in one's cell is not a "program" or "activity.")

healed from his surgery and moved to general population, he did not complain about having difficulty getting in and out of bed or on and off the toilet. The plaintiff really appears to be complaining that RCJ staff did not properly treat him while he was recovering from surgery[5], not that they were excluding him from some prison service, program, or activity because of his disability. See Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a remedy for medical malpractice.")

Further, the RCJ Defendants are entitled to summary judgment on this claim because they have shown that there was no reasonable accommodation that would have enabled the plaintiff to be housed in a handicap-accessible cell. The RCJ Defendants explain that RCJ has handicap-accessible cells only in E-wing, which is a newer part of RCJ and is a low-security, dormitory-style housing unit. The plaintiff initially was placed in medical segregation at the advice of the medical staff, who wanted to make sure he healed properly from his surgeries. They needed to locate him in a section of RCJ that was closely monitored by medical staff to make sure the plaintiff was healing properly.

Once the plaintiff was approved to be released to general population, RCJ determined, based on the plaintiff's significant criminal and behavioral history, that he should be classified at a Level 3 Maximum security classification. Dkt. No. 148 at 23. The RCJ Defendants explain that to house the plaintiff in a low-security portion of RCJ would have placed both other inmates and RCJ staff at risk. Id. Further, the RCJ Defendants explain (and the plaintiff does not

_____

[5] The court dismissed the plaintiff's deliberate indifference claim against the Medical Defendants based on his failure to exhaust the available administrative remedies prior to filing his lawsuit.

dispute) that grab rails are not in maximum security cells for security reasons, including suicide concerns. Id. at 24. To require RCJ to install grab rails in the maximum security cells would have implicated security concerns. Id. The Seventh Circuit Court of Appeals has indicated that security concerns "are highly relevant to determining the feasibility of the accommodations that the disabled prisoners need in order to have access to desired programs and services." Crawford, 115 F.3d at 487.

Finally, as discussed above, once in general population, it does not appear that the plaintiff needed grab bars. The plaintiff's only complaints were that he had trouble tying his laundry bag, making his bed, and opening the Ziploc bags containing his meals. First, the plaintiff does not state that he was *denied* these "programs" or "services" (assuming they can be classified as such), only that he struggled to perform these tasks and often had to ask others for help. Second, moving the plaintiff to a handicap-accessible cell that had grab rails would not have aided him in any of these tasks. Finally, at least with regard to the plaintiff being able to access his meals, RCJ accommodated the plaintiff's request for assistance and began to deliver his food on a tray instead of in Ziploc bags.[6]

---

[6] The plaintiff argues that it doesn't matter if his food was delivered on a tray because, at least initially, he was too weak to get out of bed to even reach it. Once again, however, the plaintiff's inability to access his food when he first arrived at RCJ was due to his weakened state from surgery, not due to his disability. The plaintiff does not allege that, once healed from the surgery, he could not get to his food—only that he could not open the bags. The ADA protects the disabled, not the sick or injured. See Bryant v. Madigan, 84 F.3d at 249.

The plaintiff has failed to create a question of material fact on his ADA/RA claims, and the RCJ Defendants are entitled to summary judgment as a matter of law.

### 4. Prosthetic Arm

The plaintiff argues that the RCJ Defendants were deliberately indifferent to his serious medical needs because they failed to schedule him for an appointment to be fitted for a prosthetic arm. The RCJ Defendants explain that no medical professional at RCJ prescribed a prosthetic arm for the plaintiff and that, to the contrary, the medical staff determined that a prosthetic arm was not medically necessary because the plaintiff still had a functioning arm. The plaintiff clarifies that he did not want RCJ to provide him with a prosthetic; he wanted RCJ staff to transport him to an appointment to be fitted for a prosthetic arm that his insurance would pay for. Wearing explained in response to the plaintiff's RCJ grievances that he would not schedule such an appointment until he received confirmation from the plaintiff's insurance company that it would pay for the prosthetic. On March 5, 2014, Wearing notified the plaintiff that he still had not received the pre-authorization from his insurance company. Dkt. No. 149-1; Dkt. No. 194, Ex. 1003A at BANKS 108.

"Prison officials violate the Eighth [and Fourteenth] Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'"

Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997)[7]. This standard contains both an objective element (*i.e.,* that the medical needs be sufficiently serious) and a subjective element (*i.e.,* that the officials act with a sufficiently culpable state of mind). Id.

As a matter of law, the plaintiff cannot establish either prong. First, the RCJ Defendants have explained that the medical staff decided that the plaintiff did not need a prosthetic arm because he still had the use of his dominant arm. The plaintiff states that his outside doctor indicated that he would benefit from a prosthetic, but this does not mean that one was medically necessary. In any event, a disagreement over treatment does not constitute a claim under the Constitution. Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996). Because a prosthetic arm was not medically necessary, the plaintiff cannot establish that his lack of a prosthetic arm was an objectively serious medical condition.

Second, even assuming the plaintiff had established an objectively serious medical condition, the court finds as a matter of law that the RCJ Defendants were not deliberately indifferent to that condition. Wearing notified the plaintiff that, because RCJ would not pay for the prosthetic arm, the plaintiff needed confirmation from his insurance company that it would pay for the prosthetic. This makes sense; the plaintiff is indigent. It would be a waste of time and resources for RCJ to transport him to an appointment that he could not pay for to be fitted for a prosthetic arm (which was not medically

---

[7] Again, because the plaintiff was a pretrial detainee, his claims arise under the Fourteenth Amendment. The standard for medical care claims under the Fourteenth and Eighth Amendments are the same. See Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003).

necessary) that he could not pay for. Because the RCJ Defendants had been told that the plaintiff did not need the prosthetic, there was no urgency in scheduling an appointment, let alone scheduling one prior to the plaintiff demonstrating that he could afford the associated costs. The RCJ Defendants are entitled to summary judgment on this claim.

## III.    CONCLUSION

The court **ORDERS** that the RCJ Defendants' motion for summary judgment (Dkt. No. 146) is **GRANTED**. The court further **ORDERS** that the Medical Defendants' motion for summary judgment (Dkt. No. 152) is **GRANTED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must

be filed within a reasonable time, generally no more than one year after the entry of the judgment.  The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 22nd day of February, 2017.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**